UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

NINA OWENS,

                                 Plaintiff,                        <u>COMPLAINT</u>

         - against -

PRICEWATERHOUSECOOPERS LLC,              <u>PLAINTIFF DEMANDS A</u>
PRICEWATERHOUSECOOPERS ADVISORY    <u>TRIAL BY JURY</u>
SERVICES LLC, and PWC US CONSULTING LLP,

                               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

          Plaintiff Nina Owens, by her attorneys, Vladeck, Raskin & Clark, P.C., complains of defendants PricewaterhouseCoopers LLP, PricewaterhouseCoopers Advisory Services LLC, and PwC US Consulting LLP (collectively "PWC") as follows:

<u>NATURE OF CLAIMS</u>

        1.      <u>FinTech</u> Magazine recently named Owens number 34 on its list of the top 100 women in the field, calling her an "influential leader and entrepreneur in the financial services industry." Despite this recognition from the field, high praise from clients, and revenue that significantly exceeded her targets, PWC forced Owens from the firm, a day before her five-year anniversary that would have afforded her greater job protection and full vesting of her 401(k) account.

        2.      As a 55-year-old Asian-American woman, Owens did not get the support and recognition that PWC gave to partners and principals who were men, white, and/or younger. PWC's age bias is so open, that it has mandatory retirement for partners and principals at age 60.

PWC has gotten away with this blatant age bias by taking the position that its thousands of partners and principals are not in fact employees entitled to the protections of the civil rights laws and (at least until some recent changes in federal law) by forcing them into secret arbitrations.

3.    PWC brought Owens in as a principal in 2019 to build out a digital transformation focused on payments, a business area that had languished for the past several years. Owens was soon disappointed.  Her first manager, a white man, did not provide her with any support or integration into the firm, prohibited her from pursuing new business opportunities outside of consumer credit cards, and took away leads that Owens generated and provided them to male partners and directors. Another white, male partner stole credit for revenue from Owens, making her tracked revenue look less positive than it actually was, and blocked her promotion to a senior role leading an account.  Another male partner engaged in gender-based abuse to Owens, tried to steal revenue credit from her, and tried to get her removed from her primary account. His conduct was so egregious that Owens filed two complaints and a female Latina Director filed an additional complaint against him with PWC's internal Ethics & Compliance ("E&C") department in August/September 2023. Owens repeatedly raised concerns about all this conduct to PWC, but PWC did not take any genuine remedial action. Instead, PWC punished Owens.

4.    In January 2023, Owens got a new manager who removed prior obstacles and allowed her to pursue a new line of business she had been trying to develop for years. Almost immediately, Owens's revenue began to increase, and after that grew exponentially. Rather than applaud Owens's success, PWC notified Owens on March 25, 2024, that she was being forced to "withdraw" from the firm no later than June 26, 2024. As of December 31, 2023, six months into PWC's fiscal year, Owens had already exceeded her annual revenue target. As of June 26, 2024,

Owens's revenues were approximately 122% of her target, even accounting for the fact that PWC pushed Owens to give up to other partners 60% of revenues she sold.

5.　　Plaintiff brings this action to remedy defendant's discriminatory and retaliatory treatment. Specifically, plaintiff brings this action to remedy violations of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); New York State Human Rights Law, N.Y. Executive Law § 296 et seq. (the "State Law"); and the New York City Human Rights Law, Administrative Code of the City of New York § 8-107 et seq. (the "City Law"); as well as to remedy unequal pay in violation of New York Labor Law § 194 ("Labor Law"). Plaintiff also brings this action to address defendant's violation of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 et seq. ("ERISA"). Plaintiff seeks compensatory, liquidated, and punitive damages, equitable and injunctive relief, and attorneys' fees and costs.

<u>JURISDICTON AND VENUE</u>

6.　　This Court has jurisdiction over plaintiff's Section 1981 and ERISA claims under 28 U.S.C. § 1331. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over plaintiff's State Law, City Law, and Labor Law claims because these claims closely relate to the Section 1981 and ERISA claims, having arisen from a common nucleus of operative facts such that all claims form part of the same case or controversy.

7.　　Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the defendants' principal office is in New York, they regularly do business in New York, New York and the acts of discrimination and retaliation occurred within the Southern District of New York.

8.      Pursuant to Section 8-502(c) of the New York City Human Rights Law, plaintiff will cause to be served a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

9.      Plaintiff is also filing a charge of discrimination and retaliation with the United States Equal Employment Opportunity Commission (the "EEOC") against defendants, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and the Age Discrimination in Employment Act, 29 U.S.C. § 6221 et seq. ("ADEA"), based on the same facts set forth in this Complaint.  When the EEOC issues Plaintiff a Notice of Right to Sue, Plaintiff will seek leave to amend this Complaint to add those causes of action.

<u>PARTIES</u>

10.      Plaintiff is a 55-year-old Asian-American woman who worked for defendants from June 2019 until she was forced out as of June 26, 2024.  She is a resident of New York City and worked for defendant in New York, New York.

11.      PricewaterhouseCoopers LLP is a limited liability partnership that provides tax and advisory services.

12.      PricewaterhouseCoopers Advisory Services LLC is a limited liability company that provides tax and advisory services.

13.      PwC US Consulting LLP is a limited liability partnership that provides tax and advisory services.

<u>FACTUAL ALLEGATIONS</u>

14.      While Owens had the title of "principal" at PWC, she, like most of the PWC partners and principals, was really an employee.  A small group of PWC partners in leadership roles runs the firm.  Owens was supervised by several layers of management, which could assign

her to work and remove her from projects and clients, prevent her from traveling to conferences or firm events, and disapprove her sales or deals from moving forward. She did not have a voice in determining the direction of the firm. Owens had "shares" of PWC, but was not truly an owner, as PWC leadership could grant or take away her shares each year as it chose. As Owens was admitted as a direct admit principal with a contingent offer, she did not have even the limited protection from dismissal afforded other principals and partners.

Plaintiff's Background

15.     Owens has over 30 years of experience in creating strategies and designing and building solutions to complex challenges in payment and money movement across Financial Technology ("FinTech") and other financial services businesses.

16.     Owens earned a bachelor's degree in Economics from Harvard University and an MBA from the Harvard Graduate School of Business Administration.

17.     Prior to working at PWC, Owens held leadership roles in consulting and finance companies, including Bain & Co.; Ernst & Young; four years at MasterCard Worldwide as Vice President, Global Leader for Payments Strategy, Processing Innovation; and six years at American Express in a few Vice President leadership roles, including in its Strategic Planning Group and global partner bank consulting business. Just before joining PWC, Owens was a Managing Director, Financial Services Northeast – Customer Insight & Growth Practice Leader for three years at Accenture, where she led a $180 million business and had more than 50 direct reports.

PWC

18.     PWC is part of a network of partnerships and other entities that comprise PricewaterhouseCoopers International Limited ("PWCIL"), an English private company.

5

PWCIL's member firms together have a global network of service providers, although each member entity operates as its own firm, subject to the laws of its home country.

19.    PricewaterhouseCoopers is the U.S. member firm of PWCIL.

20.    PricewaterhouseCoopers's "partnership" consists of "partners" and "principals."  Certified Public Accountants ("CPA"s) have the title partner, and non-CPAs have the title principal.

21.    PricewaterhouseCoopers has over 3,000 partners and principals. Among direct admit partners and principals, only 21% are women and 23% are non-white. For all partners and principals, only 24% are women and 19.7% non-white.

22.    PricewaterhouseCoopers is run by a U.S. Chair and Senior Partner along with a Board of Partners and Principals ("Board").

23.    The Chair is supported by a U.S. leadership team of 18 senior executives.

24.    Much like the CEO and leadership team of any major corporation, the Chair and the Board make key decisions about PricewaterhouseCoopers's business, including decisions affecting partners such as the allocation of shares.

25.    The leadership of PricewaterhouseCoopers decided to reorganize and move U.S.-based consulting partners and principals to PwC US Consulting LLP as of July 1, 2023. It is unclear if Owens was ever moved to PwC US Consulting. The U.S. Consulting leader is supported by the U.S. Consulting Leadership Team, comprised of 24 senior executives.

26.    When Owens signed contracts with clients, she did so on behalf of PricewaterhouseCoopers Advisory.

27.    Owens has never been asked to participate in any decision to admit or expel any partners or principals.

28.    PWC requires all partners and principals to retire at age 60.  The Board can grant limited extensions to partners and principals, but not beyond age 65.

Partner/Principal Compensation

29.    The largest portion of income for partners and principals are equity units ("shares").

30.    PWC can re-set the number of shares each year, raising, reducing, or keeping level the number of shares assigned to each partner and principal. Based on PWC's financial performance, each year PWC determines the value of a share and pays the partners and principals based on that value and the partners' current share allocation.

31.    The level of shares also correlates with a certain level of "responsibility income," essentially an amount of income that is guaranteed, in addition to the share-based compensation.

32.    PWC's fiscal year runs from July 1 to June 30.

Plaintiff's Work at PWC

33.    Owens joined PWC on June 27, 2019, as a principal in the Advisory Financial Servies practice. She was 50 years old at the time.

34.    PWC extended Owens the conditional offer on May 19, 2019, and Owens signed the offer on June 6, 2019.

35.    It was important that Owens begin working at PWC by June 28, 2019, because PWC had a Partner Retirement Plan that required ten years of service to vest in any payments. Because PWC required partners and principals to retire at the end of the fiscal year in which they turn 60, Owens would not have been able to serve for ten years before being forced to retire if she did not start before the end of the fiscal year.

36.     Under the terms of the conditional offer, PWC had up to five years to either admit Owens as a full principal, or dismiss her. Prior to full admission, Owens did not have any rights under the Partners and Principals Agreement to challenge a dismissal.

37.     Given Owens's over five years of experience as a partner at other firms, PWC should have placed her in a compensation band level reflecting that experience. Instead, PWC placed Owens in a band lever correlating to a second-year principal.

<u>Owens Faces Obstacles and Bias</u>

38.     When Owens joined, she reported to Jim Russell, a partner and leader of the US Payments Practice. Russell is a white man, who on information and belief is in his late forties.

39.     US Payments Practice performs advisory consulting for businesses in the payments area (e.g., wires, ACH, cards, checks, and other payments). Owens joined as the fourth principal in the group.

40.     PWC hired Owens to help build out the credit card business, given her extensive experience in the area. Despite discussions prior to her joining PWC and a clause in her offer letter stating that specific performance responsibilities would be determined in the first 90 days after hire, PWC never gave Owens written documentation of her responsibilities.

41.     At PWC, every partner and principal is assigned to a Primary Reporting Partner ("PRP"). The PRP is supposed to provide coaching and help integrating into PWC.  Owens was assigned to Alison Hoover, who at the time led the Banking sector of Financial Services and the Diversity and Inclusion lead for Financial Services. Hoover is white. Hoover also was, and continues to be, the PRP for Russell.

42.    In Owens's first few months, PWC leaders asked her to be the Engagement Partner ("EP") on several projects, responsible for overall client management and delivery quality of the projects.

43.    In July 2019, PWC asked Owens to be a Subject Matter Expert ("SME") for a large payments deal integration. In September 2019, the client's Head of the Business Unit and the client's project manager said that the EP, a white man, was failing to deliver quality work. PWC's account leader, Fentress Seagroves, and Financial Services Delivering Deal Value Head, Paul Kennedy, asked Owens to co-EP and lead the project to a successful conclusion in December 2019. They told Owens they thought she was going to have a great career at PWC.

44.    In March 2020, John Garvey, the Global Head of Financial Services, asked Owens to step out of the market and lead a proposal and then be EP to lead the $52 million federal Coronavirus Aid, Relief and Economic Security (CARES) Act Main Street Lending Program. In that role, leading the Program Integration Office ("PIO"), Owens oversaw three firms (including PWC) and five partner/principal-led workstreams to set up a lending facility for $600 billion in lending to all U.S. banks within five months.

45.    Russell became increasingly negative in his interactions with Owens, despite her success in her first year. He also began to make public comments about her age. For example, during a team meeting Owens said that Gerson Lehrman Group ("GLG"), a financial services company that provides experts, had asked to interview her. Russell said, in front of the entire team, that "GLG only asks people to serve as experts who are old."

46.    For FY2020, Owens exceeded her revenue target. PWC rated her a High Contributor.

47.     For most of FY2021, particularly July 2020 to March 2021, Owens worked as EP and PWC Head of the PIO delivering on two phases of the Main Street Lending project. She worked 14-16 hours a day, as well as weekends and all holidays. Owens's work was widely praised. Garvey said to Owens, "Of course, without a doubt, you will be recommended for tenure." A risk assessment conducted at the end of the fiscal year showed that Owens had brought down the risk of the build out of Main Street Lending from high risk to moderate risk.

48.     Despite Garvey's assurances, he did nothing to support Owens for tenure. Owens's subsequent PRP, Gail Vennetti, told Owens that Garvey was actively working against Owens and had said that women make terrible consulting partners. On another occasion, Vennetti said that Russell had said that women should not be partners, and that he and Garvey were working together to prevent Owens from getting tenure.

49.     Russell, as payments practice leader, limited Owens's opportunities to generate revenue. Owens was not permitted to solicit clients with whom she had worked at Accenture due to restrictive covenants. Despite this, Russell provided Owens with fewer than five leads in three years. Russell provided leads to young, white, male Directors and to his fellow white, male principals in payments. Russell also did not offer Owens any thought leadership or speaking engagement opportunities, except for one opportunity in December 2021. Russell gave opportunities to participate in conferences to younger, white men.

50.     On several occasions in FY2021 and FY2022, Owens raised concerns with Hoover about the lack of support Russell was providing. Although Hoover was also Russell's PRP, she took no action.

51.     Hoover, on a public Banking Transformation call, said that she did not think PWC should make people partners after the age 50 because the pension would not be worth it.

52.     In March 2021, PWC won a competitive process to be the sole integration partner for a large payment-processing company. Andrew Luca, the Lead Client Partner who ran Global Payments, and Hoover, then the head of Banking Transformation, said PWC was going to replace Owens on the projects with a white, male partner. Luca is white. Owens insisted that she was the right person to negotiate, given that she had launched MasterCard Advisors. PWC relented.

53.     In April 2021, Owens sold an engagement worth several million dollars that she could have delivered on her own. The client said the sale was the direct result of the new PWC-TSYS partnership, but Luca wanted to draft the contract as a change order. Luca then asked Owens to split the revenue credit with him, which he said was the norm. Owens only found out later that PWC typically does not allocate revenue to account partners such as Luca. As a result of Luca's action, Owens was credited with less than half the revenue for the engagement. In addition, on March 18, 2021, Luca had sent an email to PWC leadership, crediting a male Director with making the sale.

54.     Owens observed a pattern at PWC of men getting women to make introductions to clients and then taking over the account from the women.

55.     Had Owens been fully credited with the revenue she had generated, she would have been only slightly below her revenue target for FY2021. Even without the proper credit, PWC rated her a High Contributor.

56.     In FY2022, which ran from July 1, 2021 to June 30, 2022, Russell continued to constrain Owens's ability to generate revenue.  Russell continued to fail to provide her with any leads. Russell also took away any leads Owens obtained that were not related to card payments. Russell directed Owens that she had to team, hand over leads, and share revenue as a "good partner." Moreover, he continued to deny her thought leadership or speaking engagement

opportunities. In fact, when a significant card business buildout opportunity arose in 2022, Russell did not include Owens, but delivered it with a white, male Director.

57.    In FY2022, Owens continued to share with Hoover her concerns about Russell's lack of support. Hoover continued to take no action. Luca told Owens that Hoover had asked him for feedback about her and he provided positive feedback. Luca said that, according to Hoover, Russell did not think Owens should be a partner. In August 2021, Hoover transitioned Owens to Vennetti as Owens's new PRP.

58.    In October 2021, Owens saw a market opportunity to focus on a new area relating to payments risk. She created thought leadership and an approach to the market for this new focus. PWC provided Owens with no funding support for this new focus and Russell actively discouraged her from pursuing it. A white, male Director who was junior to Owens questioned her competence to manage an initial client in an email to PWC management.

59.    In December 2021, Hoover notified Owens and Vennetti that Owens's revenue goal was being reduced because she was doing all the right things and should continue to do so. Thereafter, however, Russell continued to give leads to others and Luca continued to divert Owens's revenue.

60.    In April 2022, Owens sold an engagement. Owens was to get 50% of the revenue allocation, and a male Managing Director the rest. Owens then got an oral commitment from the client for phase 2 to that engagement for almost four times the original revenue. For the first component, Luca stole revenue credit from Owens without her knowledge by keeping it in a master code, turning off the sweep of the revenue he had agreed Owens could keep. For the larger component, as the project was initiating, Luca, another male account partner, and a male Managing

Director took a combined 70% of the revenue. Owens was still unaware at this time that account partners did not receive revenue allocation.

61.     Owens continued to sell work to this client, including two projects in spring 2022 and a change order to ongoing work in July 2022. The change order contract was intercepted by the account team and signed by Steve Moysey, a white man about five years younger than Owens, even though Owens was the EP on the prior work. As the signing principal controls revenue allocation, this permitted Moysey and Luca to move revenue away from Owens without her knowledge. From PWC systems, it appears that they moved revenue away from Owens sometime prior to partner rating discussions in May to June 2022 and returned it sometime in September to October 2022, which negatively affected Owens's revenue for FY2022.

62.     Starting in May 2022, Julian Courbe, the former head of Financial Services and head of the Focus 500 accounts, said he wanted Owens to take over Global Payments as the Lead Client Partner by November 2022 or at the latest June 2023. Courbe had hired Owens. Owens discussed her interest in this opportunity with Hoover, Luca, and Peter Pollini, the leader of Banking and Capital Markets Solutions. Luca said he would not relinquish his leadership of Global Payments until 2026 and that he wanted Moysey to succeed him. Luca blocked Owens from being able to prove her capabilities by refusing to introduce her to senior-level clients. Pollini suggested that Owens put her name into consideration and plan to take a smaller account first in two years. Owens responded that she had responsibility for a $40 million account and $180 million business at her previous employer and thus had the experience to handle a $50 million account. As of FY2023, only 23% of PWC's Lead Client Partners were women and only 8% were Asian. Owens did not realize it at the time, but becoming a Lead Client Partner typically would have resulted in the doubling of her income.

63.     Owens continued to sell work and realize revenue, including a sole-sourced project due to her specific consumer payments expertise. She expanded an initial credit card project into more than ten times the original revenue, to net several million dollars from this client. She also originated, sold, and delivered a number of smaller projects in consumer payments and with credit card components.

64.     For FY2022, had Owens been properly credited for deals for which Luca and other men diverted revenue, she would have been well past her revenue target. PWC rated Owens a High Contributor for FY2022.

65.     In July 2022, Owens was solely responsible for selling an engagement. In October 2022, Luca directed the finance department to move all the revenue for that project to his code. In February 2023, Owens learned that Luca diverted another significant amount of revenue from her by having a male Director put the revenue in a code for Luca.

66.     In fall 2022, Owens asked PWC's Finance department to look into Luca's activities concerning her revenue. Finance said Luca's actions were not proper, but Owens does not know whether all of her revenue on the account was ever properly allocated to her.

67.     Owens told Hoover of Luca's improper actions and that PWC had allowed her to be denied proper revenue credit. Instead of assisting Owens, in November 2022, Hoover told Owens that she did not want Owens to attend a global PWC financial services event to present on the TSYS partnership she was leading. This denied Owens the opportunity to meet other principals responsible for TSYS accounts. PWC sent a younger, man to present in person instead.

<u>Owens is Finally Permitted to Pursue Business</u>

68.     In January 2023, PWC replaced Russell as lead of the U.S. Payments practice with Lane Martin.

69.     Martin immediately told Owens to stop focusing on the work to which Russell had directed her. By March 2023, after Owens had shared with Martin her current work, he told her to focus on the payments risk area she had been developing and to focus on being commercial. On March 3, 2023, Owens quickly sold a significant project in payments risk, followed in June by another project. From that point forward, Owens's revenue soared.

70.     In or about March or April 2023, Owens wanted to have an Asian-American female partner who had helped her develop the payments risk practice be her co-lead. However, Russell and Matt Bagin insisted that they (white, male partners) co-lead the practice with Owens and the Asian-American female partner.

71.     In May 2023, Luca directed Finance to take a loss on TSYS, allocating an additional six-figure loss to Owens. When Owens asked Finance what her FY2023 revenues were for that project, Finance told her it was barely more than the loss Luca allocated to Owens. Thus, Owens appears to have netted only $13,000 on a seven-figure project that she sold, which adversely affected her revenue in FY2023.

72.     For FY2023, Owens was denied credit for at least $2 million of her work as a result of Luca's actions. Had Owens received full credit for her sales, she would have met her revenue target. PWC rated Owens a Low Contributor, even though PWC knew that Luca had stolen revenue credit from her. Vennetti told Owens that despite this rating, PWC had kept her at the same share level and moved her off the New Partner compensation grid to be a Band 3 principal. Vennetti told her that her most important focus should be to hit her revenue target.

<u>Owens is Subjected to a Gender-Based Hostile Work Environment</u>

73.     In July 2023, Owens sold three projects with combined revenue in the seven figures to Client A. She agreed to co-deliver with, and split the revenue with, Vishal Rawal, a male

partner in the Strategy& group about 15 years younger than her. Although the COO of Client A had asked Owens to scope the work, Rawal changed the EP signature to his name in the final version of the contract in July 2023, which Owens did not know at the time.

74.    In July and August 2023, Owens repeatedly complained to Hoover and Vennetti that Rawal was trying to push her off the account, was allocating more than 50% of the revenue to himself, and was engaging in gender-based harassment toward her. Rawal was abusive and disrespectful toward Owens.  For example, he told Owens not to speak on conference calls and said he would do all the speaking; he pulled her into conference rooms to threaten and berate her; he told the male Directors to exclude Owens from meetings and not to follow her directions; he yelled at her in front of Directors; and he sent emails denigrating her, on which he copied junior employees. Owens never saw Rawal treat any men that way.

75.    Upon information and belief, other women partners who have worked with Rawal believe his conduct toward them was discriminatory. One female regulatory compliance partner refused to work with Rawal alone because of his behavior and reported that to her PRP. A female Director said that Rawal's behavior toward her was disrespectful and derogatory and that he asked her to violate firm policy about billing her hours; she filed a complaint about Rawal with E&C in or about August 2023.

76.    Owens repeatedly tried to bring in additional partners to the project, pointing out to Rawal that he did not have experience in many of the key components for the project. He refused and escalated his abuse toward Owens. The parts of the project being led solely by Rawal were failing according to Client A's COO.

77.    On August 1, 2023, Owens filed a formal E&C complaint against Rawal for directing team members not to bill their full hours.

78.     On August 31, 2023, Owens filed another E&C complaint against Rawal for his gender-based discriminatory harassment. Owens said that she thought Rawal was treating her in this abusive manner because she is an Asian woman. Owens copied Vennetti and Christine Lattanzo, the partner in charge of E&C.

79.     On September 3, 2023, Owens raised concerns about Rawal's discriminatory harassment to Hoover, Pollini, and Mike VanDenBerg, a principal in Cybersecurity and Privacy.

80.     While Owens was dealing with the gender-based harassment, she sold additional projects to Client A with combined revenue in the mid seven figures, which equaled more than half of her annual revenue target. The CIO of Client A personally asked Owens to deliver a seven-figure project in 14 weeks and later deemed it the most successful conversion the entity had ever done. Owens sold other payments risk projects while dealing with the harassment and the lack of support from PWC.

81.     Over Labor Day weekend 2023, a man who worked for Client A, who was a friend of Rawal, sent an email asking PWC to remove Owens from the projects.

82.     Vennetti told Owens that Rawal had clearly asked the male employee of Client A to send the email. When Client A's COO learned of the request to remove Owens, she objected, saying that Owens was "super strong," that she would "take her on any project" she had, and that Owens would not be moving off the project. The COO later told Owens that the man who had made the request was three levels below her and unimportant. As of in or about November 2023, the male employee was no longer employed by Client A.

83.     PWC kept Rawal on the project to interact with his male friend at Client A. VanDenBerg asked Owens to "take a supporting role in the back." PWC also cut off Owens's

revenue on the project as of September 30, 2023. Rawal continued to accrue revenue on Client A through at least March 2024.

84.    In mid-September 2023, Rawal instructed a Director to exclude Owens from a meeting with Client A's COO and Rawal's friend at Client A. Owens emailed VanDenBerg about this conduct and reported negative feedback about Rawal she had received from Client A.

85.    VanDenBerg told Owens that he and the Lead Client Partner had sent a letter to PWC's Board detailing Rawal's conduct.

86.    In October 2023, Hoover told Owens that she had never seen behavior as bad as that exhibited by Rawal in any partner or revenue dispute. Nonetheless, no one in PWC leadership supported Owens, including by allowing her to continue to work on that project or receive revenue, or stopped Rawal from remaining on the account and receiving revenue.

<u>Despite Owens's Success, PWC Dismisses Her</u>

87.    In December 2023, Owens sole-sourced several key payments risk projects with Client A, worth mid seven figures and equal to 80% of her annual revenue target. Owens wrote the contracts during PWC's holiday firm shutdown. PWC wanted a white, male principal to sign at least one of the contracts as EP. Owens objected, saying she would not tell the client that someone they had never met would sign the contract she negotiated and which they had trusted her to deliver as EP. PWC nonetheless required Owens to add several additional partners  to each contract and on one contract required that Owens give 40% of the revenue to a white, male partner. As a result, even though Owens sole-sourced the contracts, she only received credit for 40% of the revenue.

88.    By January 1, 2024, six months into FY2024, Owens had exceeded her revenue target for the full fiscal year.

89.     On January 23, 2024, Owens sent an email to Hoover, Sean Viergutz, a leader in PWC Series Transformation, and others in leadership notifying them that she had sold and would be delivering additional work with revenues equal to about 60% of her target for the year.

90.     Owens wanted to staff one of the major projects for Client A with the Asian-American woman who had helped Owens develop the payments risk practice. However, PWC insisted that Owens staff a white, male partner and allocate 40% of the revenue to him. Owens was allowed to staff the Asian-American woman only as an SME and give her 10% of the revenue. When the Asian-American woman asked Owens about it, Owens told her that she could not take on PWC leadership on the issue as she was fighting to maintain control as the EP.

91.     On January 31, 2024, Owens emailed Vennetti that she was already well ahead of her revenue goal for the fiscal year.

92.     As of February 2024, Owens was viewed by Client A as one of their top consultants. If PWC had allowed her to keep all of the revenue she generated from Client A, her revenue for FY2024 would have been almost two and a half times her target.

93.     Despite Owens's outstanding performance, PWC did not give her a mid-year review, but merely posted it to Partner Affairs.

94.     On March 26, 2024, Hoover and Tom Puthiyamadam, Transformation Consulting leader, told Owens that PWC's Board was going to recommend that she "withdraw" from PWC because she supposedly was unable to build out the business. They acknowledged that in the last year she drove revenues and teamed incredibly well, but said it was not enough to overcome the prior four years. They refused to acknowledge the obstacles they knew Owens had faced during her first few years, and ascribed her success once the obstacles were removed to luck.

95.     On March 28, 2024, Vennetti said that the decision on Owens was very close, and that Vennetti thought it was wrong. Vennetti said that VanDenBerg and Dietmar Serbee, leader of the Risk & Regulatory platform, had submitted very positive feedback, but the decision was ultimately made by Hoover and Puthiyamadam.

96.     Upon information and belief, on March 29, 2024, the COO of Client A called Kathryn Kaminksy, the Incoming PWC US Chief Commercial Officer and Vice Chair. The COO praised Owens to Kaminsky and said the company bought PWC to get access to Owens.

97.     On March 29, 2024, a representative from Client A asked Owens to expedite the statement of work ("SOW") on a seven-figure project and asked Owens to staff herself directly on the project. On April 4, 2024, Owens submitted the SOW, listing with herself as EP. Five senior leaders at Client A sent emails to PWC saying they wanted Owens to be the EP. However, VanDenBerg asked Owens to step aside and allow another partner to deliver the work before and after her departure. He also told Owens that Rawal continued to work on this client and would do so at least through the end of April. Client A subsequently did not move forward with the project.

98.     On March 27, 2004, FinTech Magazine named Owens number 34 on its list of the top 100 women in FinTech.

99.     On or about April 19, 2024, Hoover and Puthiyamadam met with Owens and confirmed that the Board was forcing her "withdrawal." They told her she could stay through June 26, 2024, if she chose, but no longer. Owens said she would work through June 26, 2024.

100.    PWC insisted on the June 26, 2024 date in order to deprive her of certain protections afforded partners and principals to which she would have been entitled as of June 27, 2024, her five-year anniversary. PWC's selection of that date also denied Owens vesting in various wealth building assets, including 40% of her 401(k) account matching funds.

101.    In May 2024, employees with Client A told Owens that Client A's COO had expressed severe displeasure to PWC's account partners that PWC was dismissing Owens.

102.    As of June 24, 2024, Owens was credited with revenue constituting 122% of her target. PWC denied Owens credit for about twice the revenue for which it credited her.

<u>PWC Paid Owens Less the Comparable Male and White Partners/Principals</u>

103.    From FY2020 to FY2022, PWC consistently underpaid Owens by 15-40% compared to her male and white partner/principal peers.

104.    For FY2024, PWC paid Owens 30% less that the average PWC partner in the US at her level and 38% less than the average direct admit partner in the US.

FIRST CAUSE OF ACTION
Section 1981: Race Discrimination

105.    Plaintiff repeats and realleges paragraphs 1 through 104 of this Complaint as if fully set forth herein.

106.    By the acts and practices described above, defendants have discriminated against plaintiff on the basis of her race, in violation of Section 1981.

107.    Defendants have acted with malice and/or reckless indifference to plaintiff's statutorily protected rights under Section 1981.

108.    As a result of defendants' discriminatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

SECOND CAUSE OF ACTION
State Law: Discrimination

109.    Plaintiff repeats and realleges paragraphs 1 through 108 as if fully set forth herein.

110. By the acts and practices described above, defendants have discriminated against plaintiff in the terms and conditions of her employment on the basis of her gender, race, and age in violation of the State Law.

111. Defendants have acted intentionally and with malice or reckless indifference to plaintiff's statutorily protected rights under the State Law.

112. As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

<u>THIRD CAUSE OF ACTION</u>
<u>City Law: Discrimination</u>

113. Plaintiff repeats and realleges paragraphs 1 through 112 as if fully set forth herein.

114. By the acts and practices described above, defendants have discriminated against plaintiff in the terms and conditions of her employment on the basis of her gender, race, and age in violation of the City Law.

115. Defendants engaged in discrimination with willful or wanton negligence, with recklessness, and/or with a conscious disregard of plaintiff's rights or conduct so reckless that it amounts to such disregard.

116. As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## FOURTH CAUSE OF ACTION
### Section 1981: Retaliation

117.    Plaintiff repeats and realleges paragraphs 1 through 116 as if fully set forth herein.

118.    By the acts and practices described above, defendants retaliated against plaintiff for her opposition to unlawful discrimination under Section 1981 in violation of Section 1981.

119.    Defendants acted with malice and/or reckless indifference to plaintiff's statutorily protected rights under Section 1981.

120.    As a result of defendants' retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## FIFTH CAUSE OF ACTION
### State Law: Retaliation

121.    Plaintiff repeats and realleges paragraphs 1 through 120 as if fully set forth herein.

122.    By the acts and practices described above, defendants retaliated against plaintiff for her opposition to unlawful discrimination in violation of the State Law.

123.    Defendants acted intentionally and with malice or reckless indifference to plaintiff's statutorily protected rights under the State Law.

124.    As a result of defendants' retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

<u>SIXTH CAUSE OF ACTION</u>
<u>City Law: Retaliation</u>

125.    Plaintiff repeats and realleges paragraphs 1 through 125 as if fully set forth herein.

126.    By the acts and practices described above, defendants retaliated against plaintiff for her opposition to unlawful discrimination in violation of the City Law.

127.    Defendants engaged in retaliation with willful or wanton negligence, with recklessness, and/or conscious disregard of plaintiff's rights or conduct so reckless that it amounts to such disregard.

128.    As a result of defendants' retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

<u>SEVENTH CAUSE OF ACTION</u>
<u>ERISA violation</u>

129.    Plaintiff repeats and realleges paragraphs 1 through 128 as if fully set forth herein.

130.    By the acts and practices described above, defendants dismissed plaintiff to prevent her from attaining full vesting in plans governed by ERISA, in violation of ERISA § 510.

131.    As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury and lost benefits, unless and until this Court grants relief.

<u>EIGHTH CAUSE OF ACTION</u>
<u>Labor Law</u>

132.    Plaintiff repeats and realleges paragraphs 1 through 131 as if fully set forth herein.

133.    By the acts and practices described above, defendants paid plaintiff less than men and white people for equal or substantially similar work in violation of NYLL § 194.

134.    As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, and other compensable damages unless and until this Court grants relief.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

a.    declaring that the acts and practices complained of herein are in violation of the Section 1981, State Law, City Law, ERISA and Labor Law;

b.    enjoining and permanently restraining these violations;

c.    directing defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff;

d.    directing defendants to place plaintiff in the position she would have occupied but for defendant's discriminatory and retaliatory conduct and making her whole for all earnings and other benefits she would have received but for defendants' unlawful treatment, including, but not limited to, wages, bonuses, pension, and other lost benefits;

e.    directing defendants to pay plaintiff compensatory damages, including damages for emotional distress, humiliation, and pain and suffering;

f.    directing defendants to pay plaintiff liquidated damages;

g.    directing defendants to pay plaintiff punitive damages;

h.    awarding plaintiff her reasonable attorneys' fees and costs;

   i. awarding plaintiff such interest as is allowed by law, and damages for any

adverse tax consequences stemming from an award; and

   j. granting such other and further relief as the Court deems necessary and

proper.

<u>DEMAND FOR TRIAL BY JURY</u>

   Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, a trial by jury in this action.

Dated: New York, New York
  July 22, 2024

       VLADECK, RASKIN & CLARK, P.C.


     By: <u>/s Anne L. Clark   </u>
       Anne L. Clark
       Attorneys for Plaintiff
       111 Broadway, Suite 1505
       New York, New York 10006
       (212) 403-7300