**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NINA OWENS, | Case No.: 1:24-cv-05517-GHW |
| Plaintiff, | **Oral Argument Requested** |
| v. | |
| PRICEWATERHOUSECOOPERS LLC, PRICEWATERHOUSECOOPERS ADVISORY SERVICES LLC, PWC USA LLP, PWC US GROUP LLP, and PWC US CONSULTING LLP, | |
| Defendants. | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**</u>

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     BACKGROUND .................................................................................................. 2

        A.      PwC's Ownership and Organizational Structure ..................................... 2

        B.      Owens's Ownership, Autonomy, and Influence in the Firm ................... 4

        C.      PwC Respected Owens's Withdrawal Rights Under the P&PA ............ 8

        D.      Owens's Access to Confidential Information and Her Agreement
                Confidentially to Resolve Any Disputes with PwC .............................. 9

        E.      Owens's Amended Complaint ............................................................... 10

III.    OWENS'S CASE MUST BE COMPELLED TO ARBITRATION .............................. 11

        A.      Owens Did Not Plausibly Plead a Sexual Harassment Dispute ........... 13

        A.      Owens Did Not Plausibly Plead a Sexual Harassment Dispute ........... 13

                1.      Owens's allegations do not qualify as sexual harassment under the
                        NYCHRL. ................................................................................. 13

                2.      Owens does not plausibly plead that Rawal's alleged conduct was
                        gender-based either. ................................................................ 15

        B.      Owens Cannot, in any Event, Plead a Sexual Harassment Dispute Because
                PwC Did Not Employ Her. ................................................................... 21

                1.      The Summary Judgment Standard Governs the Nature of the
                        Parties' Relationship ............................................................... 22

                2.      PwC Was Not Owens's Employer, So She Must Arbitrate Her
                        Claims. ..................................................................................... 22

IV.     CONCLUSION .................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                                                      **Page(s)**

*Anderson v. City of New York*,
    712 F. Supp. 3d 412 (S.D.N.Y. 2024)..............................................................................16, 18

*Baldwin v. TMPL Lexington LLC*,
    No. 23-CV-9899 (PAE), 2024 WL 3862150 (S.D.N.Y. Aug. 19, 2024).................................12

*Bensadoun v. Jobe-Riat*,
    316 F.3d 171 (2d Cir. 2003)...............................................................................................22

*Bowers v. Ophthalmology Grp. LLP*,
    648 F. App'x 573 (6th Cir. 2016) .......................................................................................29

*Cir. City Stores, Inc. v. Adams*,
    532 U.S. 105 (2001).............................................................................................................11

*Clackamas Gastroenterology Assocs., P. C. v. Wells*,
    538 U.S. 440 (2003).........................................................................................21, 23, 24, 25

*Dabney v. Hughes Hubbard & Reed LLP*,
    No. 1:23-MC-78 (MKV), 2023 WL 4399048 (S.D.N.Y. July 6, 2023) .....................24, 28, 29

*Daly v. Citigroup Inc.*,
    939 F.3d 415 (2d Cir. 2019)................................................................................................11

*Delo v. Paul Taylor Dance Found., Inc.*,
    685 F. Supp. 3d 173 (S.D.N.Y. 2023).......................................................................12, 16, 18

*Diaz-Roa v. Hermes L., P.C.*,
    No. 24-CV-2105 (LJL), 2024 WL 4866450 (S.D.N.Y. Nov. 21, 2024), *appeal*
    *filed*, No. 24-3223 (2d Cir. Dec. 12, 2024) ....................................................................12, 13

*Dilip Mehta, M.D. v. HCA Health Servs. of Fla., Inc.*,
    No. 8:05-CV-27-T24-TGW, 2006 WL 3133327 (M.D. Fla. Oct. 31, 2006).........................28

*Faith v. Khosrowshahi*,
    No. 21-CV-06913(JMA)(JMW), 2023 WL 5278126 (E.D.N.Y. Aug. 16,
    2023) .....................................................................................................................................14

*Gonzalez v. City of New York*,
    377 F. Supp. 3d 273 (S.D.N.Y. 2019) (Woods, J.).....................................................15, 17, 18

*Goodwine v. City of New York*,
    No. 15-CV-2868 (JMF), 2016 WL 3017398 (S.D.N.Y. May 23, 2016) ...............................17

*Hendrix v. Pactiv LLC*,
    488 F. Supp. 3d 43 (W.D.N.Y. 2020) .....................................................................18

*Hix v. Dave & Buster's Mgmt. Corp., Inc.*,
    No. 3:23-CV-623-AR, 2023 WL 9425283 (D. Or. Nov. 14, 2023), *report and
    recommendation adopted*, No. 3:23-CV-623-AR, 2024 WL 326592 (D. Or.
    Jan. 29, 2024) .....................................................................................................14

*Johnson v. Everyrealm, Inc.*,
    657 F. Supp. 3d 535 (S.D.N.Y. 2023).........................................................12, 13, 16

*Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*,
    716 F.3d 10 (2d Cir. 2013).....................................................................................19

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
    No. 06CV1495, 2009 WL 3602008 (W.D. Pa. Oct. 28, 2009), *aff'd*, No. 09-
    4498, 2010 WL 2780927 (3d Cir. July 15, 2010)...............................................25, 26

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
    No. 09-4498, 2010 WL 2780927 (3d Cir. July 15, 2010).....................................28, 29

*Lemon v. Myers Bigel, P.A.*,
    985 F.3d 392 (4th Cir. 2021) ......................................................................... *passim*

*Milan v. Wertheimer*,
    808 F.3d 961 (2d Cir. 2015).....................................................................................23

*Morgan v. Sundance, Inc.*,
    596 U.S. 411 (2022)................................................................................................11

*Newton v. LVMH Moet Hennessy Louis Vuitton Inc.*,
    No. 23-CV-10753 (LAP), 2024 WL 3925757 (S.D.N.Y. Aug. 23, 2024)..................20

*Olivieri v. Stifel, Nicolaus & Co., Inc.*,
    112 F.4th 74 (2d Cir. 2024) ....................................................................................20

*Puris v. TikTok Inc.*,
    No. 24CV944 (DLC), 2025 WL 343905 (S.D.N.Y. Jan. 30, 2025) ..........................20

*Samborski v. W. Valley Nuclear Servs. Co.*,
    No. 99-CV-0213E(F), 2002 WL 1477610 (W.D.N.Y. June 25, 2002) ......................19

*Sanderson v. Leg Apparel LLC*,
    No. 1:19-CV-8423-GHW, 2020 WL 7342742 (S.D.N.Y. Dec. 14, 2020) .................17

*Simon v. City of New York*,
    No. 17 CIV. 9575 (DAB), 2019 WL 916767 (S.D.N.Y. Feb. 14, 2019)....................16

*Singh v. Meetup LLC*,
No. 23-CV-9502 (JPO), 2024 WL 3904799 (S.D.N.Y. Aug. 22, 2024),
*reconsideration denied*, No. 23-CV-9502 (JPO), 2024 WL 4635482 (S.D.N.Y.
Oct. 31, 2024) .........................................................................................12, 13, 14

*Small v. New York City Dep't of Educ.*,
650 F. Supp. 3d 89 (S.D.N.Y. 2023) (Woods, J.) ....................................................20

*Smith v. Spizzirri*,
601 U.S. 472 (2024) ....................................................................................................11

*Solon v. Kaplan*,
398 F.3d 629 (7th Cir. 2005) ...................................................................................29

*UBS Fin. Servs. Inc. v. W. Va. Univ. Hosps., Inc.*,
660 F.3d 643 (2d Cir. 2011)......................................................................................22

*von Kaenel v. Armstrong Teasdale, LLP*,
943 F.3d 1139 (8th Cir. 2019) ...............................................................25, 26, 27, 29

*Wachovia Bank, N.A. v. VCG Special Opportunities Master Fund, Ltd.*,
661 F.3d 164 (2d Cir. 2011)......................................................................................22

*Weir v. Holland & Knight, LLP*,
34 Misc. 3d 1207(A) (Sup. Ct. N.Y. Cnty. 2011)................................................21, 28

*Yost v. Everyrealm, Inc.*,
657 F. Supp. 3d 563 (S.D.N.Y. 2023).................................................................12, 15

**Statutes**

9 U.S.C. § 2.......................................................................................................................11

9 U.S.C. § 3.......................................................................................................................11

9 U.S.C. § 4.......................................................................................................................22

9 U.S.C. § 401(4) ................................................................................................12, 20, 21

9 U.S.C. § 402(a) ......................................................................................................12, 14

42 U.S.C. § 2000e-2(a) ...................................................................................................21

N.Y. Executive Law § 296(1) .........................................................................................21

**Other Authorities**

N.Y.C. Admin. Code § 8-107(1).....................................................................................21

Pursuant to Section 3 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, Defendants PricewaterhouseCoopers LLP ("PwC LLP"), PricewaterhouseCoopers Advisory Services LLC, PwC USA LLP, PwC US Group LLP, and PwC US Consulting LLP (individually and collectively referred to herein as "PwC" or the "Firm"), move for an order compelling Plaintiff Nina Owens's action to arbitration and staying these proceedings.

## I.    <u>INTRODUCTION</u>

Nina Owens is a highly sophisticated, double-Harvard-educated professional whom PwC invited in 2019 to join its partnership and hold a coveted ownership interest as a Principal. PwC did so with the expectation that she would build out PwC's credit-card-consulting business. PwC allowed her to share in its profits and gave her access to its most confidential information about the Firm's clients, strategy, and partnership structure—all of which provides PwC a competitive advantage. In connection with these profits and advantages, PwC reasonably required that she agree to keep PwC's information confidential. This included, importantly, an agreement to bring any disputes in private arbitration to avoid Firm information about clients, strategy, or the workings of the partnership becoming public to PwC's competitive disadvantage.

After Owens underperformed for several consecutive years and failed to deliver on her business case for admission to the Firm to develop a credit-card-consulting practice, PwC decided to withdraw her from its partnership. Undoubtedly dissatisfied with that decision, she aggressively seeks to deny PwC the benefit of the bargain she struck to have disputes heard in private arbitration. She does so without any basis in fact or law. Indeed, Owens agreed to resolve confidentially *in arbitration* "[a]ny claim or controversy . . . arising out of the provisions of th[e] [partnership agreement], the interpretation thereof or the practice, business or affairs of the Firm." That is undisputed. The claims she asserts are covered by the scope of that provision. That, too, is undisputed.

1

To avoid her contractual commitment, however, Owens asks this Court to decide an issue of first impression under the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act ("EFASASHA"). She will urge this Court to determine, as a matter of law, that allegations of unprofessional conduct by another Principal—with no indicia whatsoever that the behavior either qualifies as harassment or was directed at her because of her sex—constitute "sexual harassment." This is so, Owens argues, because his conduct was allegedly "abusive and disrespectful" and she allegedly never saw men treated that way.

Applying long-established principles for determining arbitrability and the proper scope of EFASASHA, this Court should conclude that Owens has not plausibly pleaded a sexual harassment dispute within the scope of EFASASHA. The Court need go no further to compel her entire dispute to arbitration. But there is also a second, independent basis for doing so. Even if Owens had adequately pleaded sexual harassment (and she has not), it is black letter law that she cannot assert sexual harassment claims against PwC as a former owner of the Firm.

Accordingly, and for the reasons set forth in greater detail below, the Court should enforce the parties' arbitration agreement, compel Owens's claims to arbitration, and stay this action pending completion of the arbitration.[1]

## II.    BACKGROUND

### A.    PwC's Ownership and Organizational Structure

PwC is a professional services firm that provides, *inter alia*, tax and advisory services. (Defendants' Local Civil Rule 56.1(a) Statement of Undisputed Material Facts ("SUMF") ¶ 1.) PwC is owned by partners; the Firm uses the term "Partners" to refer to owners who are Certified Public Accountants ("CPAs") and "Principals" for owners who do not hold a CPA (collectively,

---

[1] Simultaneous with this filing, PwC moves to seal confidential portions of the papers filed in support of its motion.

"Partner-Owners"). (SUMF ¶ 3.) The Partner-Owners have organized PwC as a limited-liability partnership as set forth in a Partners and Principals Agreement.[2] (SUMF ¶¶ 2, 4.) All Partner-Owners agree to the P&PA as a condition of joining the partnership. (SUMF ¶ 6.) Employees do not. (*Id.*)

The P&PA governs the affairs of the Firm. Pursuant to the P&PA, all Partner-Owners have voting rights. REDACTED

REDACTED

REDACTED

REDACTED (SUMF ¶ 8.) REDACTED

REDACTED (SUMF ¶ 9.) REDACTED

REDACTED

REDACTED (SUMF ¶ 15.)

The Partner-Owners collectively delegate decision-making over certain matters to the elected Board. It has authority over, among other things: REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

---

[2] Owens agreed to the 2015 P&PA when she joined the partnership. The 2023 P&PA was operative at her withdrawal. When discussed together, they are referred to herein as "P&PAs," and, when referring generally to PwC's operative P&PA, "P&PA." (*See* SUMF ¶¶ 4, 21–22.)

REDACTED

(SUMF ¶ 11.)

The Board has standing committees, including the Partner Affairs Committee ("PAC") which has an important oversight role with respect to Partner-Owners matters. (SUMF ¶ 12.) Another is the Board Admissions Committee ("BAC"), which evaluates and votes on candidates for admission to the Firm as Partner-Owners. (*Id.*) External Board members do not presently sit on the PAC or the BAC. (*Id.*) Partner-Owners also elect the Senior Partner to function as the Chief Executive Officer of the Firm on behalf of the other Partner-Owners. (SUMF ¶ 15.)

Partner-Owners in Firm management positions adjust the quantity of each Partner-Owner's equity units with Board oversight and based, in large part, on whether the Partner-Owner's role and relative contributions (in terms of client demand and revenue generated) warrant an increase or decrease in equity units. (SUMF ¶¶ 13 & 14.) The number of equity units PwC allots to a Partner-Owner determines the proportion of PwC profits in which the Partner-Owner will be entitled to share. (SUMF ¶ 13.) REDACTED

(SUMF ¶ 14.) The majority of Partner-Owner income is associated with profits paid on the number of equity units the Partner-Owner is allocated. (SUMF ¶ 13.) The Firm reports Partner-Owners' income annually to the taxing authorities on an IRS Form K-1. (*Id.*) By contrast, PwC's thousands of employees do not share in PwC profits and losses, and the Firm reports their income annually on IRS Form W-2. (*Id.*)

**B.    Owens's Ownership, Autonomy, and Influence in the Firm**

On May 19, 2019, PwC invited Owens to join PwC LLP as a Principal (*i.e.*, a Partner-Owner). (SUMF ¶ 18.) Her invitation was contingent upon, among other things, the BAC's

4

evaluation and approval of her candidacy and Owens's contribution of capital to the Firm. (*Id.*) Owens made a substantial capital contribution, which was at risk with respect to the Firm's losses (SUMF ¶ 19.) The BAC voted to admit Owens on June 6, 2019, and she was admitted to the Firm on June 27, 2019, as a Partner-Owner. (SUMF ¶ 20.) Owens executed the 2015 P&PA on July 9, 2019. (SUMF ¶ 21.)

PwC was not her employer. She was admitted to the Firm to build a business, and, like all other Partner-Owners, Owens could participate in the management of the Firm. She could nominate others, self-nominate, or be nominated for a Board seat. (SUMF ¶ 23.) If elected, she could have served on the BAC or the PAC. (*Id.*) She was also eligible to vote on matters submitted to the Partner-Owners for a vote. (SUMF ¶ 24.) During her five years as a Partner-Owner, there were two Board elections, a Senior Partner election, and a major reorganization.[3] (SUMF ¶ 25.) Owens had the opportunity to vote in all of them. (*Id.*) Not only could she vote, but she also nominated another Partner-Owner to the Board, and she provided "soundings" (written feedback) on three candidates for the Board during the fiscal-year 2023 election. (SUMF ¶ 26.) During that same time, Owens had the opportunity to provide feedback on internal candidates for admission to the partnership. (SUMF ¶ 27.)[4] She, in fact, submitted written feedback on two internal Partner-Owner candidates during her tenure. (*Id.*)

Owens could legally commit the Firm to contracts and, when she did so, was responsible for ensuring the terms and conditions were appropriate within PwC's guidelines and for assuming

---

[3] Owens accepted admission to PwC LLP in 2019, and the Partner-Owners voted to reorganize the Firm's structure, effective July 1, 2023. (SUMF ¶¶ 6, 20–22.) Following that reorganization, she became a Partner-Owner in a coordination entity, PwC USA LLP, and two partnership entities: PwC US Group LLP and PwC US Consulting LLP. (SUMF ¶ 22.)  ███████ REDACTED ███████ (SUMF ¶ 5.)
███████ REDACTED ███████
(*Id.*)

[4] Owens falsely alleges the Firm never asked her to participate in any decision to admit or expel any Owners. (AC ¶ 29.)

the contractual risk on behalf of the Firm. (SUMF ¶ 31.) While expected to use PwC's processes for staff deployment, Owens had discretion to staff her own client engagements with PwC employees and direct the performance of their work. (SUMF ¶ 32.) PwC gave her an annual professional-development budget to use with clients to help her build the Firm's credit card consulting practice. (SUMF ¶ 41.)

Owens nominally reported to a payments practice leader—first, Jim Russell and, later, Lane Martin (SUMF ¶ 33)—within the larger Financial Services Transformation team, but practice leaders do not supervise Partner-Owners in their practice, do not require advance submission of Partner-Owners' client work, and do not otherwise direct Partner-Owners' businesses. (SUMF ¶ 35.) Instead, practice leaders provide support as helpful to their colleague Partner-Owners, which includes without limitation coordinating practice activities to drive consistency with Firm strategies, leveraging Firm resources, identifying opportunities in the market, and providing broad constructive feedback. (*Id.*) All Partner-Owners are also assigned a Primary Reporting Partner ("PRP") who provides feedback at least twice per year through structured and required conversations, and often more frequently on an informal basis if sought out by the Partner-Owner. (SUMF ¶ 39.) PRPs are encouraged to be Partner-Owner confidants, serve as career optimizers, and develop evaluation information for Partner-Owners' development, growth, and success and for submission to practice leadership. (*Id.*) Owens further had revenue goals (SUMF ¶ 37), and she was subject to the Firm's risk-management policies and procedures (SUMF ¶ 31).

Like other Partner-Owners, Owens had freedom to build PwC's credit-card-consulting practice and pursue client work. She joined PwC with the sophistication and background necessary to support her success as a Partner-Owner too. She holds undergraduate and graduate degrees from Harvard University. (SUMF ¶ 16.) Before joining PwC, she held leadership positions at

MasterCard Worldwide, American Express, and a direct competitor to PwC, Accenture, where she claimed to manage a $180 million business and team of over 50 staff. (*Id.*) Given this wealth of leadership experience, PwC recruited Owens to develop its credit card consulting business. (SUMF ¶ 17.) She acknowledges that she joined PwC to "build out a digital transformation [business] focused on payments." (*Id.*)

The onus was on Owens, then, to build the Firm's credit card business. "PwC never gave Owens written documentation of her responsibilities," she claims. (SUMF ¶ 42.) That is because Owens *led* several extant client engagements for PwC as she saw fit shortly after joining the Firm:

- in her "first few months," Owens served as "the Engagement Partner ('EP') on several projects, responsible for overall client management and delivery quality of the projects" (SUMF ¶ 43);

- in July 2019, she was co-EP and led a large payments deal integration (SUMF ¶ 44); and

- in March 2020, she was the EP and leader of the Program Integration Office overseeing three firms and five Partner-Owner-led workstreams for a $600 billion lending-facility project (SUMF ¶ 45).

Owens further alleges that, as time progressed, she did, in fact, build PwC's credit card business. She bound the Firm to and subsequently led a range of client engagements (unlike an employee):

- in April 2021, Owens "sold an engagement worth several million dollars" (SUMF ¶ 46);

- in October 2021, she "created thought leadership and an approach to the market" for "a new area relating to payments risk" (SUMF ¶ 47);

- in April 2022, she "sold an engagement" (SUMF ¶ 48);

- in spring and July 2022, she sold "two projects" and "a change order to ongoing work" (*Id.*);

- she sold "a sole-sourced project due to her specific consumer payments expertise," "expanded an initial credit card project into more than ten times the original revenue,

to net several million dollars," and "originated, sold, and delivered a number of smaller projects in consumer payments and with credit card components" (SUMF ¶ 49);

- in March and June 2023, she "sold [two] significant project[s] in payments risk" (SUMF ¶ 50);

- in July 2023, she "sold three projects with combined revenue in the seven figures to Client A" (SUMF ¶ 51);

- she "sold additional projects to Client A with combined revenue in the mid seven figures" (SUMF ¶ 52); and

- in December 2023, she "sole-sourced several key payments risk projects with Client A, worth mid seven figures" (SUMF ¶ 53).

The evidence and Owens's own allegations demonstrate that PwC was not her employer. She was an owner in the Firm.

### C. PwC Respected Owens's Withdrawal Rights Under the P&PA.

The Partner-Owners have agreed to processes for their *withdrawal* from the Firm—they cannot be *fired* like ordinary employees. (SUMF ¶ 55.) This further demonstrates her status as an owner.

REDACTED

(SUMF ¶ 56.)    REDACTED

(SUMF ¶ 57.)

REDACTED

(SUMF ¶ 58.)    REDACTED

(SUMF ¶ 59.)

REDACTED

(*Id.*)

REDACTED

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (SUMF ¶ 60.) PwC returned Owens's

capital contribution to her on July 12, 2024. (SUMF ¶ 61.)

     **D.**    **Owens's Access to Confidential Information and Her Agreement Confidentially to Resolve Any Disputes with PwC**

Another feature of being a Partner-Owner at PwC is access to sensitive, confidential information concerning the business and financial state of the Firm. (SUMF ¶ 28.) For instance, on the Partner Portal (accessible via PwC's Intranet), Owens could review confidential Firm financial information and updates, Firm strategic and business planning documents, Firm accounting, distribution, expense, cash-flow, income, and tax statements and projections, Board governance and election documentation, Board communications, and annual letters from the Senior Partner summarizing outcome of the Partner-Owner evaluation and profit allocation process, among other things. (SUMF ¶ 30.) Each fiscal year, Owens was also invited to attend PwC's Fall Partner Experience and Spring Partner-Owner meetings, as well as webcasts delivered to Partner-Owners during which updates on confidential Firm matters were shared with Partner-Owners. (SUMF ¶ 28.) She further received communications from the Senior Partner containing important updates about the Firm's business that were not shared with employees. (SUMF ¶ 29.) Employees cannot access the Partner Portal or Senior Partner communications referenced above and are not invited to attend the Fall Partner Experience, Spring Partner-Owner meetings, or Partner-Owner webcasts. (SUMF ¶ 28.)

Importantly, to protect the foregoing confidential information shared only with Partner-Owners, the P&PA requires that Partner-Owners submit their disputes to confidential arbitration. Specifically, all Partner-Owners (including Owens) agree to arbitrate "[a]ny claim or controversy . . . arising out of the provisions of th[e] [P&PA], the interpretation thereof or the practice, business

or affairs of the Firm" before the American Arbitration Association (the "AAA"). (SUMF ¶ 7.)

###    E.    Owens's Amended Complaint

On July 22, 2024, Owens commenced this action against PwC in contravention of that arbitration agreement. (*See* ECF 1.) She amended her complaint on October 2, 2024. (*See* ECF 24.) She brings claims against PwC under, *inter alia*, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; N.Y. Executive Law § 296 *et seq.*; and the Administrative Code of the City of New York § 8-107 *et seq.* (the "NYCHRL").

This is not a sexual harassment dispute. Owens's allegations pertain to economic disputes with her fellow Partner-Owners over revenue credit, business, lead, and speaking opportunities. (AC ¶¶ 40-88.) Her allegations culminate in a challenge to her supposedly unlawful withdrawal from the partnership. (*Id.* ¶¶ 89-104, 107-49.) Of the *152* allegations in her Amended Complaint, Owens directs the Court to just 13 to invoke EFASASHA. (ECF 19 at 2.) Those 13 allegations are part of her same overarching economic dispute, however.

Specifically, Vishal Rawal allegedly changed the Engagement Partner signature on a contract pursuant to which he and Owens were supposed to co-deliver and split the revenue of three projects for Client A. (AC ¶ 75.) He also allegedly tried to push her off the account, including by allegedly asking a friend at Client A to ask PwC to remove Owens from the projects. (*Id.* ¶¶ 76, 83-84.) Further, he allegedly told Owens not to speak on conference calls, threatened and berated her in conference rooms, told Directors to exclude her from meetings and ignore her directions, yelled at her in front of Directors, and sent emails "denigrating" her. (*Id.* ¶ 76.) She allegedly complained to PwC about his conduct and that he directed team members not to bill their full hours. (*Id.* ¶¶ 79-80.) As explained in greater detail below, these allegations do not state a claim for sexual harassment.

10

III.    <u>**OWENS'S CASE MUST BE COMPELLED TO ARBITRATION.**</u>

      In assessing motions to compel arbitration, courts consider: "(1) 'whether the parties agreed to arbitrate'; (2) 'the scope of that agreement'; and (3) 'if federal statutory claims are asserted, . . . whether Congress intended those claims to be nonarbitrable.'" *Daly v. Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019) (ellipsis in original) (citation omitted).

      In its September 5, 2024, letter to the Court, PwC identified Owens's agreement to arbitrate in the P&PAs as the basis for requesting a pre-motion conference. (*See* ECF 18.) Owens did not (and cannot) contest the existence of this agreement. (*See* ECF 19.) Owens also did not (and cannot) dispute that her broad arbitration provision—applying to "[a]ny claim or controversy . . . arising out of the provisions of th[e] [P&PA], the interpretation thereof or the practice, business or affairs of the Firm" (SUMF ¶ 7)—covers her claims. Therefore, the Court must determine if, as she insists, Congress intended her claims to be non-arbitrable.

      Congress enacted the FAA in "response to hostility of American courts to the enforcement of arbitration agreements . . . ." *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 111 (2001). That is why the FAA provides that Arbitration provisions "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. It is also why courts must "hold a party to its arbitration contract just as the court would to any other kind." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022) (citation omitted). So, "[w]hen a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA *compels the court* to stay the proceeding." *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) (emphasis added); *accord* 9 U.S.C. § 3.

      Against the backdrop of the #MeToo movement, Congress created a mechanism for *employees* whose contracts of employment are covered by the FAA to invalidate pre-dispute

arbitration provisions if their case "relat[es] to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law." 9 U.S.C. § 401(4). EFASASHA provides that an employee's pre-dispute arbitration agreement is not valid or enforceable if the employee is "alleging *conduct* constituting a sexual harassment dispute." 9 U.S.C. § 402(a) (emphasis added). EFASASHA defines a "sexual harassment dispute" as "a dispute relating to *conduct* that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law." *Id.* § 401(4) (emphasis added). To resolve the narrow question of whether the conduct Owens alleged constitutes sexual harassment under applicable law—such that she may invalidate her pre-dispute arbitration agreement—the Court should apply the plausibility standard governing Rule 12(b)(6) motions. *See Singh v. Meetup LLC*, No. 23-CV-9502 (JPO), 2024 WL 3904799, at *2 (S.D.N.Y. Aug. 22, 2024), *reconsideration denied*, No. 23-CV-9502 (JPO), 2024 WL 4635482 (S.D.N.Y. Oct. 31, 2024); *Baldwin v. TMPL Lexington LLC*, No. 23-CV-9899 (PAE), 2024 WL 3862150, at *6 (S.D.N.Y. Aug. 19, 2024); *Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 550 (S.D.N.Y. 2023); *Yost v. Everyrealm, Inc.*, 657 F. Supp. 3d 563, 577 (S.D.N.Y. 2023); *Delo v. Paul Taylor Dance Found., Inc.*, 685 F. Supp. 3d 173, 180 (S.D.N.Y. 2023).[5]

There are two reasons Owens cannot leverage EFASASHA to avoid her agreement to

---

[5] Judge Liman recently proposed a different standard; namely, that a plaintiff alleging sexual harassment or sexual assault may void their arbitration agreement except if their claim is "immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Diaz-Roa v. Hermes L., P.C.*, No. 24-CV-2105 (LJL), 2024 WL 4866450, at *20 (S.D.N.Y. Nov. 21, 2024) (citation omitted), *appeal filed*, No. 24-3223 (2d Cir. Dec. 12, 2024). That decision is currently pending review at the Second Circuit. Judge Liman's formulation is contrary to the standard articulated by other courts in this Circuit and around the country and Owens's counsel assertion *four times* on the record that Owens's "claims are analyzed under the motion to dismiss standard," which "simply requires that the plaintiff allege plausibly that she was treated less well because of her . . . gender." (ECF 23 at 9:1-8; *accord id.* at 12:12-20; 13:4-10; 14:10-25.) Critically, however, *Diaz-Roa* is manifestly different from this case because the allegations there amounted to sexual harassment regardless of whether the court reviewed them for plausibility or frivolity. *See Diaz-Roah*, 2024 WL 4866450, at *22 (alleging supervisors "encouraged Plaintiff to flirt with potential clients, to use her appearance to attract business, and to become romantically involved with individuals in the industry"; and that one supervisor "fixated" on her appearance "by directing her to fix her makeup and accusing her of looking tired," "placed Plaintiff into a physically 'compromising' position by sliding behind her on a scooter," and "compared Plaintiff to a piece of steak at a business dinner").

arbitrate. First, she has not plausibly pleaded a sexual harassment dispute as that term is defined in EFASASHA. Second, PwC was not Owens's employer.

### A.    Owens Did Not Plausibly Plead a Sexual Harassment Dispute.

As described above, employees must plead plausible claims of "sexual harassment" and "sexual assault" for exemption from arbitration under EFASASHA. Application of the prevailing EFASASHA jurisprudence requires granting PwC's motion because Owens failed to state a plausible claim of sexual harassment.

1.    Owens's allegations do not qualify as sexual harassment under the NYCHRL.

None of Owens's allegations are sexual in nature. The Court should not endorse her tenuous invocation of EFASASHA by reference to her sex *discrimination* claims.

As a threshold matter, the Court assesses whether Owens has pleaded a plausible claim of sexual harassment under the most lenient substantive standard that is applicable: here, the NYCHRL.[6] *Johnson*, 657 F. Supp. 3d at 552 ("[T]he Court here applies the NYCHRL, because the NYCHRL supplies the—or ties with the NYSHRL for the—the most lenient applicable liability standard.").

Sexual harassment claims are a discrete subset of NYCHRL sex discrimination claims to which EFASASHA applies. *See Diaz-Roa*, 2024 WL 4866450, at *22 ("It also is reasonable to believe that, under New York City law, sexual harassment is distinguished from discrimination on the basis of sex more generally because it involves either a *quid pro quo* or a hostile work environment based on sex."); *Singh*, 2024 WL 3904799, at *5–6 ("[W]hen sexual harassment claims have been litigated under the NYCHRL, successful plaintiffs have alleged conduct or

---

[6] Although EFASASHA makes no reference to local law and PwC does not concede its applicability thereunder, PwC nevertheless assumes *arguendo* the Court will consider it in evaluating the plausibility of Owens's claims. *See Johnson*, 657 F. Supp. 3d at 552 n.14.

language of . . . [a] romantic, sexual, or lewd nature . . . . [N]ot all gender discrimination is sexual harassment.").

Thus, where plaintiffs invoke the NYCHRL as the most lenient standard for their sexual harassment claims, courts have limited EFASASHA's reach to alleged conduct that is "romantic, sexual, or lewd" in nature. *See Singh*, 2024 WL 3904799, at *5–7 (holding plaintiff failed to state a claim within EFASASHA's ambit despite alleging conduct that "surely constitute[s] gender discrimination under the NYCHRL" because she "has not alleged harassing conduct or the kind of inappropriate comments that would rise to what the courts have determined constitutes 'sexual harassment' under the NYCHRL"); *Faith v. Khosrowshahi*, No. 21-CV-06913(JMA)(JMW), 2023 WL 5278126, at *7 n.5 (E.D.N.Y. Aug. 16, 2023) ("Plaintiff alleges employment discrimination by Defendants . . . not a 'sexual harassment dispute or sexual assault dispute' that would trigger EFA[SASH]A's provisions." (citation omitted)). This approach is consistent with the fact that EFASASHA also covers "sexual assault dispute[s]," 9 U.S.C. § 402(a), and that its "passage is widely attributed to the #MeToo movement," *Hix v. Dave & Buster's Mgmt. Corp., Inc.*, No. 3:23-CV-623-AR, 2023 WL 9425283, at *1 (D. Or. Nov. 14, 2023), *report and recommendation adopted*, No. 3:23-CV-623-AR, 2024 WL 326592 (D. Or. Jan. 29, 2024).

As explained above, Owens's allegations pertain to economic disputes with her fellow Partner-Owners over revenue credit and business opportunities. (*Supra* § II.E.) Her allegations culminate in a challenge to her supposedly unlawful withdrawal from the partnership. (*Id.*) She attempts to manufacture support for her argument that her pleading is within the ambit of EFASASHA by arguing Rawal's alleged facially neutral conduct qualifies as "gender-based harassment." (ECF No. 19 at 2.) But even then, Owens does not argue or allege Rawal engaged in any romantic, sexual, or lewd conduct. (*See* AC ¶¶ 75-88.) The Court should hold that EFASASHA

is inapplicable to her pleading on its face and compel her claims to arbitration.

      2.   <u>Owens does not plausibly plead that Rawal's alleged conduct was gender-based either.</u>

Even if Owens could state a claim for sexual harassment without alleging any sexual behavior whatsoever (and she cannot), she still fails to plead that she experienced gender-based harassment. While Owens is a woman and alleges in conclusory fashion that she "never saw Rawal treat any men" in the same manner (*see* AC ¶ 76), nothing in the Amended Complaint suggests that Rawal's behavior was gender-based.

"[A] plaintiff *must* still allege that he has been treated 'less well' than other employees *because of* a protected characteristic." *Gonzalez v. City of New York*, 377 F. Supp. 3d 273, 302 (S.D.N.Y. 2019) (Woods, J.) (second emphasis in original) (citation omitted); *accord Yost*, 657 F. Supp. 3d at 580 (observing that "generalized hostility or generally uncivilized behavior is not actionable . . . . the defendant's offending conduct *must* have been keyed to a protected characteristic of the plaintiff" (emphasis added)). Indeed, "the broader remediation available under the City law does not allow the Plaintiff to dispense with linking his claim of hostility to some attitude that the law forbids." *Harris*, 2013 WL 3487032, at *27 (citation omitted).

Owens's allegations do not satisfy this basic pleading requirement for sexual harassment claims. She alleges Rawal told her "not to speak on conference calls and said he would do all the speaking," "pulled her into conference rooms to threaten and berate her," "told the male Directors to exclude [her] from meetings and not to follow her directions," "yelled at her in front of Directors," and "sent emails denigrating her, on which he copied junior employees." (AC ¶ 76.) Owens "never saw Rawal treat any men that way." (*Id.*) Rawal also allegedly asked a male friend who worked for Client A to remove Owens from that client's projects. (*Id.* ¶¶ 83-84.) Owens allegedly complained to PwC about Rawal's conduct. (*Id.* ¶¶ 80-81.) And, "[u]pon information and

belief," one female Partner refused to work with Rawal "because of his behavior," and a female Director said his "behavior toward her was disrespectful and derogatory." (*Id.* ¶ 77.)

These allegations are manifestly deficient under the NYCHRL. Rawal did not allegedly communicate anything to Owens or others about her sex. He did not allegedly yell at, threaten, or berate her in a manner suggesting it had anything to do with her sex. He did not allegedly exclude or tell others to exclude her because of her sex. He did not allegedly scheme to have her removed from Client A's projects because of her sex. Even her "information and belief" allegations about his conduct toward other women does not say what he did or why it has anything to do with their sex. There is simply no hook for the Court to hold Owens's *sexual* harassment claim is plausible. *Cf. Johnson*, 657 F. Supp. 3d at 554–56 (ruling that plaintiff pleaded plausible NYCHRL sexual harassment claim by alleging CEO repeatedly pressured him to have sex with her, colleagues, and clients); *Delo*, 685 F. Supp. 3d at 183–84 (same where interviewer asked visibly pregnant plaintiff "[w]hat will she do with the baby," "'chastised' her in front of her team for bringing her newborn child on a performance trip," criticized her for bringing her baby to work despite allowing her husband to do the same thing, and reached across her body and hovered closely over her while she was pumping breast milk).

At most, Owens's allegations amount to non-gender-based bullying, as they require the Court to *assume* Rawal's alleged and facially neutral conduct was gender-based. That is a bridge too far in this circuit. *See, e.g.*, *Anderson v. City of New York*, 712 F. Supp. 3d 412, 423 (S.D.N.Y. 2024) (finding that plaintiff failed to state NYCHRL sexual harassment claim where she alleged coworker engaged in facially neutral "campaign of intimidation," "including throwing objects, slamming doors, and staring at [her] in common spaces"); *Simon v. City of New York*, No. 17 CIV. 9575 (DAB), 2019 WL 916767, at *10 (S.D.N.Y. Feb. 14, 2019) (holding that plaintiff's

allegations that supervisor hovered over her workstation, yelled and shouted at her at close range, told her that "she liked him," and generally made her afraid of him were "insufficient to allege that she received 'unequal treatment' that was '*based on* gender'" (emphasis in original) (citation omitted)); *Goodwine v. City of New York*, No. 15-CV-2868 (JMF), 2016 WL 3017398, at *3, *9 (S.D.N.Y. May 23, 2016) (holding that plaintiff failed to state plausible NYCHRL sexual harassment claim where she alleged supervisor required her to perform menial tasks, canceled regular meetings with her, excluded her from other meetings, ignored her, shouted at her, and downgraded her responsibilities; and second supervisor insulted her, threatened her, and instructed his staff to intimidate and harass her).

This Court's own rulings illustrate the dichotomy between well-pleaded discriminatory animus and facially neutral alleged harassment entirely divorced from any protected characteristic. In *Sanderson v. Leg Apparel LLC*, this Court held that the plaintiff stated a plausible NYCHRL sexual harassment claim by alleging his supervisor "*intended*" to embarrass him and diminish his success by means of his perceived sexual orientation, including by making two *comments about a client being his boyfriend*. No. 1:19-CV-8423-GHW, 2020 WL 7342742, at *8 (S.D.N.Y. Dec. 14, 2020) (Woods, J.) (emphases added). "Accordingly," this Court concluded, "Plaintiff has adequately alleged that he was treated less well *as a result of* his perceived sexual orientation." *Id.* (emphasis added). By contrast, in *Gonzalez*, this Court held that the plaintiff failed to state a plausible NYCHRL disability harassment claim where he alleged his supervisor knew he had medical problems but directed him to move 54 heavy boxes anyway, rejected his request for assistance, and repeatedly denied his requests for leave to recover. 377 F. Supp. 3d at 298 (Woods, J.). As this Court put it, "his claim fails because he does not plead any facts to render plausible that

17

the treatment that he complains of was *motivated* by his disability—which he must do." *Id.* at 299 (emphasis in original).

Here, there is no nexus between Owens's allegations of unprofessional behavior and sex. The conclusory labels Owens places on Rawal's alleged conduct—that he engaged in "gender-based harassment" and "discriminatory harassment," and that his conduct toward other women "was discriminatory"—cannot salvage her claim. (*See* AC ¶¶ 75-88.) Without any specific factual allegations illustrating *how* or *why* his alleged conduct qualifies for those labels, Owens's *ex post facto* characterizations cannot establish Rawal's discriminatory animus. *See Delo*, 685 F. Supp. 3d at 183 (finding allegations conclusory that plaintiff's supervisor treated another coworker in "a brusque manner because she was a woman," and that it was "obvious" plaintiff's supervisor fired plaintiff because of supervisor's "simmering discriminatory and retaliatory animus"); *Anderson*, 712 F. Supp. 3d at 436 ("Plaintiff's conclusory assertion she was 'subjected to these conditions based on [her] protected characteristics' is insufficient to plausibly state the 'campaign of intimidation' she experienced was due her gender, race, religion, or perceived disability." (alteration in original)).

Additionally, the bare allegation that Owens did not see Rawal treat men the same way as her is *per se* insufficient to state a plausible NYCHRL sexual harassment claim. Were it otherwise, every workplace grievance would plead a NYCHRL sexual harassment claim every time a plaintiff alleges not to have seen the same behavior meted to others. That is not the law. *See Anderson*, 712 F. Supp. 3d at 430, 436 ("Furthermore, without more facts to show discriminatory motive, the allegation that male employees were not subject to the harassment also falls short of stating a claim."); *Hendrix v. Pactiv LLC*, 488 F. Supp. 3d 43, 55 (W.D.N.Y. 2020) (holding that allegations that older Caucasian male team leaders yelled and screamed at plaintiff, but "it was very rare for

18

them to raise their voice at a Caucasian colleague," "add[ed] nothing of substance to his claims"); *Samborski v. W. Valley Nuclear Servs. Co.*, No. 99-CV-0213E(F), 2002 WL 1477610, at *1 n.1 (W.D.N.Y. June 25, 2002) (finding allegations that male co-workers were not subject to same conduct were "merely an attempt to bootstrap non-actionable harassment," and, if credited, would allow a plaintiff to "turn a non-actionable allegation that she was harassed because she has purple hair into an actionable claim for sex-based discrimination by simply alleging that male co-workers were not harassed for having purple hair").

 For good measure, Owens's other allegations undermine any inference that Rawal's conduct was because of Owens's sex. Several allegations suggest his conduct was economically driven. (*See* AC ¶¶ 76 (alleging "Rawal was trying to push her off the account" and "allocating more than 50% of the revenue to himself"), 77 (alleging Rawal instructed a female Director "to violate firm policy about billing her hours"), 79 (alleging Owens complained to PwC that Rawal directed "team members not to bill their full hours"), 88 (alleging Rawal and Owens's dispute was a "*partner or revenue dispute*" (emphasis added)).) Others suggest Rawal's conduct was based on Owens's age or race. (*See id.* ¶¶ 75 (alleging Rawal was about 15 years younger than Plaintiff), 80 (alleging Owens complained to PwC that Rawal was mistreating her "because she is an *Asian woman*" (emphasis added)).)

Finally, Owens's reliance on her alleged complaint to PwC about Rawal's conduct is misplaced. (*See* AC ¶¶ 80-81.) Because he did not (even allegedly) sexually harass her, her complaint about him was not, *ipso facto*, protected activity. *See Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 15–17 (2d Cir. 2013) (affirming order granting motion to dismiss retaliation claim because plaintiff failed to plead underlying conduct she complained about to employer was sexual harassment, so her complaint was not protected

activity); *Small v. New York City Dep't of Educ.*, 650 F. Supp. 3d 89, 103–05 (S.D.N.Y. 2023) (Woods, J.) (granting school's motion to dismiss teacher's NYCHRL retaliation claim because teacher only complained about student's harassment of teacher on basis of teacher's sexual orientation, which could not constitute workplace harassment). Thus, Owens's professed retaliation claim does not "relat[e] to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law." 9 U.S.C. § 401(4). Cases in this circuit applying EFASASHA based on retaliation claims are all distinguishable on that ground. *See Olivieri v. Stifel, Nicolaus & Co., Inc.*, 112 F.4th 74, 78–79, 92 (2d Cir. 2024) (applying EFASASHA because plaintiff premised retaliation claim on complaint about supervisor who "would call her into his office during the workday for long, closed-door meetings, during which he brought up topics ranging from his sex life with his wife to rape"; watched pornography in front of her; touched her hand; and "placed his palm on her buttocks"); *Puris v. TikTok Inc.*, No. 24CV944 (DLC), 2025 WL 343905, at *4, *6–7 (S.D.N.Y. Jan. 30, 2025) (same because plaintiff complained to employer about "visibly intoxicated" vendor who "forced [her] to sit next to him by physically blocking her," "touched her arm repeatedly," and "asked her where to party after the dinner" and "where they could go dancing"); *Newton v. LVMH Moet Hennessy Louis Vuitton Inc.*, No. 23-CV-10753 (LAP), 2024 WL 3925757, at *1 (S.D.N.Y. Aug. 23, 2024) (same because plaintiff complained to employer about coworker who lingered in and outside her office, made comments about her appearance, and "press[ed] his pelvis and genitals against her").

In sum, Owens failed to state an NYCHRL sexual harassment claim—thus removing this case from the ambit of EFASASHA—because she did not plausibly allege Rawal possessed a gender-based discriminatory motive.

**B.** **Owens Cannot, in any Event, Plead a Sexual Harassment Dispute Because PwC Did Not Employ Her.**

The foregoing legal analysis requires the Court to compel Owens to arbitrate her claims because she failed to state a plausible claim of sexual harassment. But as a second, independent basis to compel arbitration, Owens cannot allege sexual harassment under the NYCHRL or any other statute because she was a PwC Partner-Owner, not an employee.

All the laws Owens seeks to leverage in her Amended Complaint to argue that she has a sexual harassment dispute protect *employees* from *employer* behavior. 42 U.S.C. § 2000e-2(a) (It "shall be an unlawful employment practice *for an employer* . . . ." (emphasis added)); N.Y. Executive Law § 296(1) (It "shall be an unlawful discriminatory practice: (a) *For an employer* . . . ." (emphasis added)); N.Y.C. Admin. Code § 8-107(1) (It "shall be an unlawful discriminatory practice: (a) *For an employer* . . . ." (emphasis added)). And as explained above, EFASASHA applies to sexual harassment claims "under applicable Federal, Tribal, or State law[,]" 9 U.S.C. § 401(4), which arise exclusively from an employment relationship.

If PwC did not employ Owens, however, then she cannot bring sexual harassment claims. *See Clackamas Gastroenterology Assocs., P. C. v. Wells*, 538 U.S. 440, 449 (2003); *Weir v. Holland & Knight, LLP*, 34 Misc. 3d 1207(A) (Sup. Ct. N.Y. Cnty. 2011) (dismissing NYCHRL and NYSHRL claims because the plaintiff was a law-firm partner). And, in turn, she cannot avail herself of EFASASHA.

1.    The Summary Judgment Standard Governs the Nature of the Parties' Relationship.

It is well settled that, where courts are "required to determine arbitrability . . . the summary judgment standard is appropriate." [7] *Wachovia Bank, N.A. v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011) (quoting *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003)). The Second Circuit regularly applies the summary judgment standard under Rule 56 to determine the nature of the parties' relationship when it bears on the arbitrability of their dispute. *See, e.g.*, *id.* (determining as a matter of law that defendant was not a "customer" and therefore did not have to arbitrate its claims); *UBS Fin. Servs. Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 643 (2d Cir. 2011) (affirming dismissal of suit to enjoin FINRA arbitration because, in light of the undisputed facts, the defendants were "customer[s]" of the plaintiffs as a matter of law); *Bensadoun*, 316 F.3d at 174, 178 (reversing district court's order that required parties to arbitrate because district court proceedings were "quite limited" and did not address material fact issue of whether plaintiff was a "customer" and thus did not have to arbitrate his claims).

EFASASHA did not disturb these foundational principles of law under the FAA,[8] which the Court should apply to resolve the issue of whether Owens was a PwC employee or owner.

2.    PwC Was Not Owens's Employer, So She Must Arbitrate Her Claims.

For five years, Owens reaped the profits of ownership in one of the most elite professional services firms in the world. She had access to confidential client, strategic, and partnership

---

[7] Either Owens failed to plead a plausible sexual harassment claim or the undisputed material facts show she was not an employee who can plead one in the first instance. Should the Court disagree, however, and determine there is an issue of material fact requiring the Court to "proceed summarily to the trial thereof," 9 U.S.C. § 4, then the Court should hold a bench trial. Owens agreed to waive her right to a jury trial in the P&PA that governed her tenure with PwC following its reorganization in July 2023 (*supra* § II.B).

[8] Indeed, courts have held that the EFASASHA only requires consideration under the Rule 12(b)(6) standard for determining whether the "conduct" alleged constitutes a sexual harassment dispute under applicable law, not for resolving the nature of the parties' relationship. (*See supra* § III.)

information and the support of other Partner-Owners to grow a credit-card consulting business. PwC simply asks the Court to confirm the common-sense conclusion that Owens was an owner, not an employee, and hold her to her agreed contractual obligation to arbitrate her claims confidentially.

Remarkably, Owens, a double-Harvard graduate, asks the Court to eschew both the plain language of the P&PAs and the undisputed material facts indicating she was a Firm owner because, she alleges, she "was really an employee." (AC ¶ 16.) The Court should reject that demonstrably false and conclusory allegation. *See Milan v. Wertheimer*, 808 F.3d 961, 963 (2d Cir. 2015) (observing that courts need not accept "conclusory allegations or legal conclusions couched as factual [] allegations" (alteration in original) (citation omitted)). Instead, the Court should apply the factors endorsed by the Supreme Court to determine whether Owens was an employee:

> "Whether the organization can hire or fire the individual or set the rules and regulations of the individual's work";

> "Whether and, if so, to what extent the organization supervises the individual's work";

> "Whether the individual reports to someone higher in the organization";

> "Whether and, if so, to what extent the individual is able to influence the organization";

> "Whether the parties intended that the individual be an employee, as expressed in written agreements or contracts"; and

> "Whether the individual shares in the profits, losses, and liabilities of the organization."

*Clackamas Gastroenterology*, 538 U.S. at 449–50 (citation omitted). But none of the six factors suggest Owens was a PwC employee in any event.

At a high level, equity partners in professional services firms "receive[] consistent treatment from" courts applying these factors because such partners are the paradigmatic example

of owner-employers, not employees. *Dabney v. Hughes Hubbard & Reed LLP*, No. 1:23-MC-78 (MKV), 2023 WL 4399048, at *7 (S.D.N.Y. July 6, 2023) (collecting circuit court decisions). Indeed, such firms have a "typical bi-level hierarchy, with associates being classic 'employees,' while the equity partners (unlike typical employees) buy into the firm, share in its profits, and vote on matters with respect to how the firm operates and is governed." *Id.* (holding law firm equity partner was unlikely to demonstrate success on ADEA and ERISA claims for purposes of preliminary injunction because he was not employee). As shown below, the exact same is true of PwC.

A review of each of the *Clackamas* factors, as shown below, points to Owens as a Partner-Owner, not an employee. She cannot avail herself of the sexual harassment claims giving rise to EFASASHA's arbitrability exception.

a.    *PwC did not and could not hire or fire Owens.*

PwC did not hire Owens. The BAC evaluated her candidacy and voted affirmatively to *admit* her to PwC's partnership. (*Supra* § II.B.) That invitation to join the partnership was contingent on her accepting the 2015 P&PA and making a capital contribution to the partnership in exchange for equity, something employees do not do. (*Id.*)

PwC also did not fire Owens. Nor could her practice leaders or PRPs. (*Supra* § III.C.) ██

█████████████████████ REDACTED █████████████████████

████████ (*Id.*) ████████ REDACTED ████████

█████████████ (*Id.*) █████████ REDACTED █████████

███████████████████████████████████████████████

█████████████████████████ (*Id.*)

These are not the usual hiring and firing procedures applicable to ordinary employees. *See Lemon v. Myers Bigel, P.A.*, 985 F.3d 392, 398 (4th Cir. 2021) (holding that law firm equity partner

24

who "could only be fired by a majority vote of the full Board" was not employee); *von Kaenel v. Armstrong Teasdale, LLP*, 943 F.3d 1139, 1144 (8th Cir. 2019) (same because partner "was required to make a capital contribution and sign the partnership agreement").

> b.    *PwC neither supervised nor set rules and regulations for Owens's work, and she did not report to someone higher in the organization.*[9]

Partner-Owners at PwC expect one another to develop, maintain, and grow their practices and perform client work without supervision by other Partner-Owners. The same was true of Owens. The few constraints applicable to her did not govern the *performance* of her work. She even admits as much in the Amended Complaint.

By her own allegations, PwC did not supervise Owens's provision of client services or advice. PwC allegedly admitted her to its partnership so she would develop and lead its credit-card-consulting business. (*Supra* § II.B.) Immediately upon joining PwC, Owens allegedly led all extant client projects on which she worked. (*Id.*) Thereafter, she allegedly developed the Firm's consulting practice by selling and then leading a number of client projects. (*Id.*) She alleges that she also led the creation of a payments-risk subpractice area for the Firm. (*Id.*) She was an owner with significant latitude to build the business.

Consistent with Partner-Owners leveraging the strategy, relationships, and support of their colleagues, Owens did have a nominal reporting relationship with her practice leaders. Her practice leaders identified market opportunities for her and provided broad constructive feedback for building the Firm's consulting practice and leveraging Firm resources and strategy to do so. (*Id.*)

---

[9] Given the substantial overlap between some of the *Clackamas* factors, PwC analyzes them jointly where, as here, it is appropriate. *See Kirleis v. Dickie, McCamey & Chilcote, P.C.*, No. 06CV1495, 2009 WL 3602008, at *18 (W.D. Pa. Oct. 28, 2009) (considering jointly rules and regulations of individual's work, extent organization supervises individual, and whether individual reports to someone higher in organization), *aff'd*, No. 09-4498, 2010 WL 2780927 (3d Cir. July 15, 2010).

This relationship should not be mistaken, however, for a traditional supervisor-subordinate relationship. Most significantly, practice leaders did not give Owens formalized work directives and did not require advance submission and review of her substantive work. (*Id.*); *see Lemon*, 985 F.3d at 397–98 (holding law firm equity partner was not employee because other partners reviewed her work only "to assure quality control and provide feedback; reviewing shareholders did not have any authority to mandate that the authoring shareholder make any specific revisions"); *von Kaenel*, 943 F.3d at 1144 (same because "the practice group leader did not review [partner's] substantive work"); *Kirleis*, 2009 WL 3602008, at *21 (same given absence of "dispute that plaintiff maintained almost complete autonomy with regard to her own clients").

Nor did PwC set rules governing the manner of and means by which Owens provided consulting services. Owens does not allege that PwC required her to perform work in a particular way for any single client project. (*See generally* AC.) Rather, PwC's only limits and expectations were universally applicable to all Partner-Owners and had nothing to do with the *performance* of her work. For example, Owens had revenue goals and had to comply with the Firm's risk-management policies and procedures. (*Supra* § II.B); *see Lemon*, 985 F.3d at 397–98 (ruling that law firm equity partner was not employee because she "enjoyed a high degree of independence in discharging her duties as partner" even though her work was subject to review "pursuant to a policy that applied equally to all shareholders"); *Kirleis*, 2009 WL 3602008, at *19–21 (same where "rules and regulations governing every attorney" applied to partner's work for firm's largest client).

Simply put, PwC gave Owens the freedom to develop the Firm's consulting practice and cultivate client relationships by providing client services how she wished consistent with overall Firm strategy.

26

c.    *Owens could influence PwC like other Partner-Owners could.*

Owners of a business, particularly in large professional service firms like law and consulting firms, traditionally exercise control through rights to vote on important Firm matters. Owens indisputably enjoyed such control on matters of utmost important to PwC. (*Supra* § II.A.) During her tenure, that included a Senior Partner and two Board elections, and a major reorganization of the Firm. (*Id.*) She, in fact, participated in Firm governance, including by nominating another Partner-Owner to run for election to the Board, providing "soundings" (written feedback) on three candidates for the Board during the fiscal year 2023 election, and providing written feedback on two internal candidates for admission to the partnership. (*Id.*)

Owens could have also nominated herself for the Board or been nominated by another Partner-Owner. (*Id.*) Had she won a Board seat, she would have been responsible for determining the value of and adjustments to the number of equity units awarded to each Partner-Owner. (*Id.*) She also could then have served on the BAC REDACTED—the very committees that approved her admission to REDACTED the partnership, respectively. (*Id.*) Additionally, Owens could legally commit the Firm to contracts and was responsible for assuming contractual risk on behalf of the Firm. (*Supra* § II.B.) Even Owens's allegations confirm that she and other Owners could bind PwC to client agreements, such as statements of work. (AC ¶ 28 ("When Owens signed contracts with clients, she did so on behalf of PricewaterhouseCoopers Advisory.").)

Owens's participation in the most consequential matters to the Firm over the last five years, ability to seek nomination to the Board and its committees, and power to commit PwC to client work are indicia of ownership, not employment. *See Lemon*, 985 F.3d at 397 (finding that law firm equity partner was not employee because she "commanded one vote in all matters," so no other partners "had greater voting power" than her, and "[n]o one had more of a right to run for election" to firm's decision-making body than her); *von Kaenel*, 943 F.3d at 1144 (same because partner

"had the right to vote on changes proposed to the partnership agreement" and "the right to vote on admission of new partners to the partnership"); *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, No. 09-4498, 2010 WL 2780927, at *2 (3d Cir. July 15, 2010) (same because partner "ha[d] the ability to participate in [firm's] governance"); *Dabney*, 2023 WL 4399048, at *7 (same because partner could "vote on matters with respect to how the firm operates and is governed").

        d.     *Owens's invitation to join the Firm and execution of the P&PA reflect the parties' intent that she was an owner.*

PwC invited Owens to join PwC LLP as a "Principal," one of two categories of Firm Partner-Owners, not an employee. (*Supra* § II.A.) She then agreed to the 2015 P&PA, an agreement exclusively for Partners and Principals and captioned as such, which is also not executed by employees and has no substantive applicability to PwC employee rights or obligations. (*Id.*) These documents reflect that the parties intended for her to be a Partner-Owner, not an employee. *See Weir*, 34 Misc. 3d 1207(A), at *7 (holding law firm equity partner was not employee because his "status as a partner was memorialized in an agreement to bound by the Partnership Agreement"); *Dilip Mehta, M.D. v. HCA Health Servs. of Fla., Inc.*, No. 8:05-CV-27-T24-TGW, 2006 WL 3133327, at *6 (M.D. Fla. Oct. 31, 2006) (holding that radiologist was owner in partnership of physicians, not employee, because his role "was memorialized in a partnership agreement, not an employment contract"). Indeed, even at the time of this filing, Owens publicly represents on her LinkedIn profile that she was a "Partner" at PwC. *See* Nina (Castro) Owens, LINKEDIN https://www.linkedin.com/in/ninacastroowens/ (last visited Feb. 7, 2025).

        e.     *Owens shared in PwC's profits, losses, and confidential information.*

Upon her admission to PwC, Owens made a capital contribution to the Firm in exchange for equity units. (*Supra* § II.B.) That capital was at risk with respect to the Firm's losses. (*Id.*) Her equity also entitled her to profit distributions, which comprised most of her earnings. (*Supra* §

II.A.) She could be allocated greater (or fewer) equity units if her role or relative contributions merited an increase (or decrease), most notably in consideration of the client demand and revenue she generated (or did not). (*Id.*) Additionally, the value of her equity units fluctuated depending on Firm performance. (*Id.*) PwC also reported all income Owens received on an IRS Form K-1, not W-2. (*Id.*) These facts indicate Owens was an owner, not an employee. *See Lemon*, 985 F.3d at 397 (finding law firm equity partner was not employee because she was "compensated according to a formula that varied with the 'profits [and] losses' of the firm, as befitted a co-owner and employer"); *von Kaenel*, 943 F.3d at 1144 (same because partner "benefitted in the firm's profits and was disadvantaged by its losses"); *Kirleis*, 2010 WL 2780927, at *2 (same because partner was "entitle[d] to a percentage of DMC's profits, losses, and liabilities"); *Solon v. Kaplan*, 398 F.3d 629, 633 (7th Cir. 2005) (same because partner "held an equity interest in the firm, shared in its profits, attended partnership meetings, and had access to private financial information"); *Dabney*, 2023 WL 4399048, at *7 (same because partner bought into the firm and shared in its profits).

In Partner-Owner meetings, webcasts, Senior Partner updates, and on the Partner Portal, Owens had access to a substantial variety of Firm confidential information and updates. (*Supra* § II.C.) This reflects the economic reality that she was an owner with access to PwC's most sensitive information for the purpose of operating its business. Such information is not accessible to employees. (*Id.*) And this distinction further reflects how Owens was a Firm owner. *See Solon*, 398 F.3d at 633 (finding law firm equity partner was not employee because partner "had access to private financial information"); *Bowers v. Ophthalmology Grp. LLP*, 648 F. App'x 573, 579 (6th Cir. 2016) (same because ophthalmology group partner "requested and received the Group's confidential financial information").

29

*                    *                    *

The undisputed material facts (and Owens's allegations) prove that PwC was *not* her employer. Thus, she cannot bring sexual harassment claims against it under the anti-discrimination statutes. "To hold otherwise would be to stretch the concept of 'employee' well past its breaking point and needlessly upend understandings that have been central to the organization of firm partnerships for decades." *Lemon*, 985 F.3d at 397.

## IV.    **CONCLUSION**

Owens agreed to arbitrate any disputes she might have with the Firm. She did not plead a plausible claim of sexual harassment that might qualify for EFASASHA's exemption. PwC also did not employ her, so she cannot bring sexual harassment claims pursuant to the applicable anti-discrimination laws. Accordingly, this Court should order Owens to submit her claims to arbitration pursuant to the Agreement and stay this action pending completion of those proceedings.

Dated: New York, New York          Respectfully Submitted
        February 7, 2025


                              PAUL HASTINGS LLP


By: _____

Kenneth W. Gage, Esq.
Daniel S. Richards, Esq.
200 Park Avenue
New York, New York 10166
Phone: (212) 318-6000
Fax: (212) 230-7646
kennethgage@paulhastings.com
danrichards@paulhastings.com

30

*Attorneys for Defendants*
PricewaterhouseCoopers LLP,
PricewaterhouseCoopers Advisory Services LLC,
PwC USA LLP, PwC US Group LLP, and PwC
US Consulting LLP