```
                                                        ┌──────────────────────────────────┐
                                                        │ USDC SDNY                        │
                                                        │ DOCUMENT                         │
                                                        │ ELECTRONICALLY FILED             │
                                                        │ DOC #: _____         │
                                                        │ DATE FILED:  6/12/2025           │
                                                        └──────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                              :
NINA OWENS,                                   :
                                              :
                           Plaintiff,         :          1:24-cv-5517-GHW
                                              :
              -v-                             :          MEMORANDUM OPINION &
                                              :                   ORDER
PRICEWATERHOUSECOOPERS LLC, *et al.*,         :
                                              :
                           Defendants.        :
                                              :
-------------------------------------------------------------- X
GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

Defendants (collectively "PwC" or the "Firm") recruited Plaintiff Nina Owens to join the

Firm to develop its credit card consulting business.  Owens alleges that after she joined the Firm, her

colleagues and supervisors provided little support, deprived her of opportunities, stole credit for

work she generated, and treated her with hostility.  Owens alleges that she faced age, race, and

gender discrimination as well as a hostile work environment.  She raised concerns about the alleged

discriminatory harassment to her "primary reporting partner" and filed a formal ethics and

compliance complaint.  PwC's board later forced her "withdrawal."  Her mandatory withdrawal date

was set at the day before her five-year anniversary, the date on which various benefits would vest.

Owens commenced this action asserting claims of discrimination and retaliation on the basis

of age, race, and gender under federal, state, and city law.  She also asserts that PwC violated ERISA.

Shortly after Owens commenced this action, PwC initiated an arbitration proceeding claiming that

Owens breached the non-competition and client-solicitation provisions of her partnership

agreement.  PwC moved this Court to compel arbitration of the claims in this action.  Owens moved

this Court to stay the pending arbitration.  Because Owens plausibly alleges sexual harassment under

the New York City Human Rights Law, PwC's motion to compel is denied.  Because PwC's claims

raised in the pending arbitration are not a part of this "case," Owens's motion to stay the arbitration is denied.

## II.     BACKGROUND

### A.  Parties

PwC is a professional services firm that provides, among other things, tax and advisory services.  Dkt. No. 71 ¶ 1.  PwC is organized as a Delaware limited liability partnership.  *Id.* ¶ 2.  Owens is a 55-year-old Asian-American woman and a resident of New York.  Dkt. No. 24 ("Am. Compl.") ¶ 10.  On May 19, 2019, PwC made Owens an invitation to join the firm as a "Principal."  Dkt. No. 71 ¶ 18.  She was admitted to the firm on June 6, 2019, *id.* ¶ 20, and she entered into the 2015 Partners and Principals Agreement with PwC on July 9, 2019.  *Id.* ¶ 21; *see* Dkt. No. 45-1 (the "2015 P&PA").

### B.  Owens's Allegations[1]

#### 1.  Owens's Position at the Firm

"PWC brought Owens in as a principal in 2019 to build out a digital transformation focused on payments."  Am. Compl. ¶ 3.  While she held the title of "principal," she was "supervised by several layers of management."  *Id.* ¶ 16.  And while she owned "shares" of PwC, "PwC leadership could grant or take away her shares each year as it chose."  *Id.* ¶¶ 16, 32.  Because Owens was admitted as a "direct admit principal with a contingent offer," she lacked the "protection from dismissal afforded other principals and partners" to challenge her dismissal.  *Id.* ¶¶ 16, 38.  "Under the terms of the conditional offer, PWC had up to five years to either admit Owens as a full principal, or dismiss her."  *Id.* ¶ 38.

---

[1] For purposes of determining whether Owens has plausibly pleaded certain claims, the Court accepts the following facts alleged in the Amended Complaint as true.

### 2. Owens Is Deprived of Opportunities and Has Credit Taken From Her

Owens started at PwC at age 50. *Id.* ¶ 35. At first, she "reported to" Jim Russell, a white man. *Id.* ¶ 40. "In Owens's first few months, PWC leaders asked her to be the Engagement Partner on several projects, responsible for overall client management and delivery quality of the projects." *Id.* ¶ 44. In March 2020, John Garvey asked her to lead a coronavirus-related project to set up a lending facility for $600 billion. *Id.* ¶ 46.

Despite her early success, "Russell became increasingly negative in his interactions with Owens" and "began to make public comments about her age," such as implying that she is "old." *Id.* ¶ 47. She alleges that Russell told another partner that "women should not be partners." *Id.* ¶ 50. She also alleges that Garvey made a comment about women making "terrible consulting partners." *Id.*

Russell "limited Owens' opportunities to generate revenue" by providing her with fewer leads than he provided young, white, male directors and principals. *Id.* ¶ 51. He even "took away any leads Owens obtained that were not related to card payments" and "directed" her to "hand over leads" to others. *Id.* ¶ 58. He also did not offer her any speaking engagement opportunities despite giving those opportunities to younger, white men. *Id.* ¶¶ 51, 58. She reported this conduct to her "primary reporting partner" Alison Hoover, but Hoover "took no action." *Id.* ¶ 52. On a public call, Hoover had made a comment that "she did not think PwC should make people partners after the age 50 because the pension would not be worth it." *Id.* ¶ 53. At one point, Hoover informed Owens that PwC was going to replace Owens on a large project with a white, male partner, but after Owens insisted that she stay on the project, "PwC relented." *Id.* ¶ 54.

According to the Amended Complaint, an account partner, Andrew Luca, repeatedly caused Owens to share her revenue credit with himself and other partners. On the first occasion, he told Owens that "split[ting] the revenue credit . . . was the norm." *Id.* ¶ 55. "Owens only found out later

that PWC typically does not allocate revenue to account partners such as Luca." *Id.* "As a result of Luca's action, Owens was credited with less than half the revenue for the engagement." *Id.* On top of that, Luca "sent an email to PwC leadership, crediting a male Director with making the sale." *Id.* "Owens observed a pattern at PWC of men getting women to make introductions to clients and then taking over the account from the women." *Id.* ¶ 56. On another occasion, "Luca stole revenue credit from Owens without her knowledge by keeping it in a master code, turning off the sweep of the revenue he had agreed Owens could keep." *Id.* ¶ 62. Luca, another male partner, and a male managing director "took a combined 70% of the revenue." *Id.* Meanwhile, "Owens was still unaware . . . that account partners [like Luca] did not receive revenue allocation." *Id.*

On a different project, a "change order contract was intercepted by the account team and signed by Steve Moysey, a white man about five years younger than Owens, even though Owens was the [Engagement Partner] on the prior work." *Id.* ¶ 63. "As the signing principal controls revenue allocation, this permitted Moysey and Luca to move revenue away from Owens without her knowledge." *Id.* This had a negative effect on Owens's revenue calculations for fiscal year 2022. *Id.* "For FY2022, had Owens been properly credited for deals for which Luca and other men diverted revenue, she would have been well past her revenue target." *Id.* ¶ 66. And yet again, "[i]n October 2022, Luca directed the finance department to move all the revenue for [a] project to his code" even though Owens "was solely responsible for selling [the] engagement." *Id.* ¶ 67. Owens eventually reported Luca to PwC's finance department, which found that Luca's actions "were not proper." *Id.* ¶ 68. But Owens never found out whether the revenue on her account was every properly reallocated to her. *Id.*

"Owens told Hoover of Luca's improper actions and that PwC had allowed her to be denied proper revenue credit." *Id.* ¶ 69. "Instead of assisting Owens, in November 2022, Hoover told Owens that she did not want Owens to attend a global PWC financial services event to present on

the TSYS partnership she was leading." *Id.* "This denied Owens the opportunity to meet other principals responsible for TSYS accounts." *Id.* "PWC sent a younger, man to present in person instead." *Id.*

### 3. Owens Experiences Hostility and Is Forced to Withdraw From PwC

In January 2023, PwC replaced Russell as lead of the U.S. Payments practice with Lane Martin. *Id.* ¶ 70. "Martin immediately told Owens to stop focusing on the work to which Russell had directed her." *Id.* ¶ 71. She worked on developing her own projects and began making sales, and "[f]rom that point forward, Owens' revenue soared." *Id.*

In July 2023, Owens agreed to co-deliver a project with Vishal Rawal, a male partner fifteen years younger than her. *Id.* ¶ 75. Rawal attempted to "push her off the account." *Id.* ¶¶ 75–76, 84. He allocated more than 50 percent of the revenue to himself. *Id.* ¶ 76. He was "abusive and disrespectful towards Owens." *Id.* He told her not to speak on conference calls; he "pulled her into conference rooms to threaten and berate her"; he told male directors to exclude her from meetings and not to follow her directions. *Id.* He also "yelled at her in front of directors" and denigrated her in front of junior employees. *Id.* Owens never observed Rawal treat male coworkers in these ways. *Id.*

Other female partners who have worked with Rawal believed that his behavior towards them was similarly "disrespectful and derogatory" and reported his behavior to their "primary reporting partner" or to the ethics and compliance department. *Id.* ¶ 77. In late August 2023, Owens herself filed a formal ethics and compliance complaint against Rawal for his alleged gender-based harassment. *Id.* ¶ 80. She also raised concerns about his behavior to other partners at the Firm. *Id.* ¶ 81.

Shortly thereafter, one of the partners to whom she raised concerns told her to "take a supporting role in the back" on the project with Rawal. *Id.* ¶ 85. "PwC also cut off Owens's

revenue on the project as of September 30, 2023" while Rawal "continued to accrue revenue on [it] through at least March 2024." *Id.* This was in spite of the fact that the client "reported negative feedback about Rawal." *Id.* ¶ 86. "[N]o one in PwC leadership supported Owens" on this matter. *Id.* ¶ 88.

In December 2023, "Owens sole-sourced several key payments risk projects" with one of her clients, but PwC "required Owens to add several additional partners to each contract and on one contract required that Owens give 40% of the revenue to a white, male partner." *Id.* ¶ 89. "As a result, even though Owens sole-sourced the contracts, she only received credit for 40% of the revenue." *Id.* "If PWC had allowed her to keep all of the revenue she generated from [the client], her revenue for FY2024 would have been almost two and a half times her target." *Id.* ¶ 94.

In March 2024, Owens was told that PwC's board was going to recommend that she "withdraw" from PwC "because she supposedly was unable to build out the business." *Id.* ¶ 96. "They refused to acknowledge the obstacles they knew Owens had faced during her first few years, and ascribed her success once the obstacles were removed to luck." *Id.* Owens's major client urged PwC to keep her on and offered her more projects. *Id.* ¶¶ 98–99. But on April 19, 2024, Hoover told Owens that the board was forcing her "withdrawal." *Id.* ¶ 101. She could stay through June 26, 2024 if she chose, but "no longer." *Id.* June 27, 2024 was her five-year anniversary and the date on which Owens's "various wealth building assets, including 40% of her 401(k) account matching funds," vested. *Id.* ¶ 102.

### C. The Pending Arbitration

The 2015 P&PA includes an arbitration agreement, which provides:

> Any claim or controversy (including without limitation a claim or controversy involving a Former [Principal]) arising out of the provisions of this Agreement, the interpretation thereof or the practice, business or affairs of the Firm shall be settled by arbitration conducted by the American Arbitration Association ("AAA") in the City of New York in accordance with the Commercial Arbitration Rules of the AAA then in effect, or such other alternative dispute resolution ("ADR") service as the parties

may agree.

2015 P&PA § 12.1(a).

On September 5, 2024, PwC initiated an arbitration before the American Arbitration Association (the "AAA Action"). Dkt. No. 67 ¶ 2. In the AAA Action, PwC asserted breach of contract claims, alleging that Owens engaged in competition and client solicitation in violation of the P&PA (the "AAA Claims"). *Id.* ¶¶ 2–3.

### D. Procedural History

Owens commenced this action on July 22, 2024. Dkt. No. 1. Owens filed the Amended Complaint on October 2, 2024. Dkt. No. 24. This action was stayed pending mediation on October 17, 2024. Dkt. No. 27. On January 21, 2025, the parties informed the Court that mediation failed to resolve the dispute. Dkt. No. 32.

On February 7, 2025, PwC filed a motion to compel arbitration of Owens's claims. Dkt. No. 43. PwC filed a memorandum of law in support of the motion to compel, Dkt. No. 44 ("Compel MOL"); a Local Rule 56.1 Statement, Dkt. No. 48; and declarations in support of the motion, Dkt. Nos. 45–47. On March 10, 2025, Owens filed a memorandum of law in opposition to the motion to compel, Dkt. No. 60 ("Compel Opp."); a response to PwC's 56.1 Statement, Dkt. No. 62; and a declaration in opposition to the motion, Dkt. No. 61. On April 4, 2025, PwC filed a reply memorandum, Dkt. No. 70 ("Compel Reply"); a reply to the 56.1 Statement, Dkt. No. 71; and a declaration in support of the motion, Dkt. No. 72.

On February 14, 2025, Owens filed a motion to stay the AAA Action. Dkt. No. 54. She filed a memorandum of law in support of the motion, Dkt. No. 56 ("Stay MOL"); a Local Rule 56.1 Statement, Dkt. No. 55; and a declaration in support of the motion, Dkt. No. 57. On March 20, 2025, PwC filed a memorandum of law in opposition to the motion to stay the AAA Action, Dkt. No. 66 ("Stay Opp."), and a response to Owens's 56.1 Statement, Dkt. No. 67. On April 14, 2025,

PwC filed a reply memorandum, Dkt. No. 76 ("Stay Reply"), and a reply to the 56.1 statement, Dkt. No. 75.

On May 12, 2025, Owens filed a motion to temporarily stay the AAA Action pending resolution of the competing motions to compel arbitration and to stay the arbitration. Dkt. No. 81. PwC filed opposition on May 19, 2025. Dkt. No. 82. Owens filed a reply on May 21, 2025. Dkt. No. 83.

### III.    LEGAL STANDARD

#### A.  The Federal Arbitration Act

Section 4 of the Federal Arbitration Act (the "FAA") provides that parties can petition the district court for an order compelling arbitration. *See* 9 U.S.C. § 4. Section 4 of the FAA provides:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

9 U.S.C. § 4. A party has "refused to arbitrate" within the meaning of Section 4 if it "commences litigation or is ordered to arbitrate the dispute by the relevant arbitral authority and fails to do so." *LAIF X SPRL v. Axtel, S.A. de C.V.*, 390 F.3d 194, 198 (2d Cir. 2004) (citation and brackets omitted); *see also Jacobs v. USA Track & Field*, 374 F.3d 85, 89 (2d Cir. 2004) (finding no refusal to arbitrate where respondents had neither commenced litigation nor failed to comply with an order to arbitrate).

In order to determine whether an action should be sent to arbitration, courts in this Circuit engage in the following inquiry:

> [F]irst, [the court] must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending

arbitration.

*JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004) (quoting *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 75–76 (2d Cir. 1998)).  "In deciding a motion to compel arbitration, 'the role of courts is limited to determining two issues: i) whether a valid agreement or obligation to arbitrate exists, and ii) whether one party to the agreement has failed, neglected or refused to arbitrate.'"  *Beijing Shougang Mining Inv. Co. v. Mongolia*, 11 F.4th 144, 162 (2d Cir. 2021) (quoting *LAIF X SPRL*, 390 F.3d at 198).

"It has long been settled that arbitration is a matter of contract and that, therefore, a party cannot be compelled to arbitrate issues that a party has not agreed to arbitrate."  *Id.* at 567 (citations omitted).  "The question of whether the parties have agreed to arbitrate, *i.e.*, the 'question of arbitrability,' is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise."  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (citation omitted) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).  "This principle flows inexorably from the fact that arbitration is simply a matter of contract between the parties."  *Id.* (quotation and brackets omitted); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (holding that "arbitration is a matter of contract" (quotation omitted)); *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (holding that, with respect to an arbitration agreement, "as with any other contract, the parties' intentions control" (quotation omitted)).  Hence, "[t]he threshold question of whether the parties indeed agreed to arbitrate is determined by state contract law principles."  *Nicosia*, 834 F.3d at 229 (citation omitted).

However, "[t]he Supreme Court has interpreted the FAA broadly, finding a 'liberal federal policy favoring arbitration agreements.'"  *Bynum v. Maplebear Inc.*, 160 F. Supp. 3d 527, 533 (E.D.N.Y. 2016) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)) (brackets omitted).  Furthermore, "[t]he Arbitration Act establishes that, as a matter of federal law, any doubts

concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25.

"[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp. Alabama v. Randolph*, 531 U.S. 79, 91 (2000) (citations omitted); *see also Application of Whitehaven S.F., LLC v. Spangler*, 45 F. Supp. 3d 333, 342–43 (S.D.N.Y. 2014) ("Whether it argues that arbitration is improper because the arbitration agreement is invalid under a defense to contract formation, or asserts that the arbitration contract does not encompass the claims at issue, either way, the resisting party shoulders the burden of proving its defense." (quotation omitted)).  If the Court determines "that an arbitration agreement is valid and the claim before it is arbitrable, it must stay or dismiss further judicial proceedings and order the parties to arbitrate." *Patterson v. Raymours Furniture Co.*, 96 F. Supp. 3d 71, 75 (S.D.N.Y. 2015) (quotation omitted).

### B.  The Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act

The Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (the "EFAA") amended the FAA by carving out an exception to section 4.  The EFAA provides:

> Notwithstanding any other provision of this title, at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute, or the named representative of a class or in a collective action alleging such conduct, no predispute arbitration agreement or predispute joint-action waiver shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute.

9 U.S.C. § 402(a).  A "sexual harassment dispute" is "a dispute relating to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law."  9 U.S.C. § 401(4).

Courts in the Southern District have almost uniformly employed a "plausibility standard" in determining whether a plaintiff has "alleged" conduct constituting sexual harassment.  *See Yost v. Everyrealm, Inc.*, 657 F. Supp. 3d 563, 585–88 (S.D.N.Y. 2023); *Brazzano v. Thompson Hine LLP*, No.

24-cv-01420 (ALC) (KHP), 2025 WL 963114, at *6 (S.D.N.Y. Mar. 31, 2025) (collecting cases); *Singh v. Meetup LLC*, 750 F. Supp. 3d 250, 253 (S.D.N.Y. 2024), *reconsideration denied*, No. 23-cv-9502 (JPO), 2024 WL 4635482 (S.D.N.Y. Oct. 31, 2024) (collecting cases). Judge Liman, in a case now up on appeal before the Second Circuit, disagreed, reasoning that "the EFAA speaks to 'allegations,' *i.e.* the content of a pleading, and not to the conclusion that those allegations plausibly state a claim for relief if the pleading is challenged under Rule 12(b)(6)." *Diaz-Roa v. Hermes L., P.C.*, 757 F. Supp. 3d 498, 535 (S.D.N.Y. 2024). Because, as discussed below, the Court finds that Owens plausibly pleads sexual harassment under the NYCHRL, the Court need not weigh in on whether the appropriate standard in EFAA cases is the higher 12(b)(6) standard or Judge Liman's allegation standard. *See Brazzano*, 2025 WL 963114, at *7 ("[T]he question of whether the predominant view or Judge Liman's less stringent threshold is correct is irrelevant here: at least one of Brazzano's sexual harassment claims are plausible under *Twombly* and *Iqbal*.").

## IV.    DISCUSSION

### A.  Motion to Compel Arbitration and Stay Proceedings

PwC moves this Court to compel arbitration of Owens's claims in this case. Because Owens plausibly alleges conduct constituting sexual harassment under the New York City Human Rights Law (the "NYCHRL"), the arbitration provision in Owens's employment agreement is unenforceable against her in this action. Therefore, the Court declines to compel arbitration of her claims.

### 1.  How the NYCHRL Interacts with the EFAA

This case presents an interesting issue regarding how the EFAA interacts with the NYCHRL. As discussed above, the EFAA applies where a person alleges "conduct constituting" "sexual harassment under applicable Federal, Tribal, or State law." 9 U.S.C. §§ 401(4), 402(a).

Owens claims that PwC engaged in conduct constituting sexual harassment under the NYCHRL.[2]

However, the NYCHRL does not create a claim of "sexual harassment." Nor does it define what conduct constitutes "sexual harassment." Instead, the NYCHRL simply makes it unlawful "[f]or an employer or an employee or agent thereof, because of the actual or perceived . . . gender . . . of any person . . . [t]o discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a)(3). To establish liability under § 8-107(1)(a)(3), "the plaintiff need only demonstrate . . . 'that she has been treated less well than other employees because of her gender.'" *Mihalik v. Credit Agricole Cheuvreux N.A., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (quoting *Williams v. New York City Hous. Auth.*, 872 N.Y.S.2d 27, 39 (N.Y. App. Div. 1st Dept. 2009)). New York law recognizes that sexual harassment is "one species of sex- or gender-based discrimination." *Williams*, 872 N.Y.S.2d at 37, 39. "[T]he NYCHRL, based on its clear textual meaning, protects employees against both 'discrimination' *and* 'sexual harassment.'" *Singh*, 750 F. Supp. 3d at 256 (citing N.Y.C. Admin Code § 8-101). "So long as the mistreatment could be considered either sexual harassment *or* gender-based discrimination, it would fall under the NYCHRL's protection." *Id.* Therefore, the NYCHRL does not give courts guidance on what distinguishes conduct constituting "sexual harassment" within the broader category of conduct that constitutes "gender discrimination." *See Singh*, 750 F. Supp. 3d at 255–56.

Because the EFAA applies only where there are allegations of conduct constituting "sexual harassment" under the state law, the question thus becomes which allegations under the NYCHRL's "gender discrimination" provision also fall within the scope of the EFAA's "sexual harassment"

---

[2] Owens asserts claims under both the New York State and the New York City anti-discrimination laws. The Court will analyze whether Owens's allegations state a plausible claim under the NYCHRL, N.Y.C. Admin. Code § 8-107, because it "provides the most lenient applicable liability standard." *Singh*, 750 F. Supp. 3d at 255 (internal quotation marks omitted). The Court agrees with the analysis in *Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 552 n.14 (S.D.N.Y. 2023), and *Delo v. Paul Taylor Dance Found., Inc.*, 685 F. Supp. 3d 173, 182 n.2 (S.D.N.Y. 2023), that the term 'State law' in 9 U.S.C. § 401(4) encompasses the law of states' subdivisions and therefore includes the NYCHRL. *See Singh*, 750 F. Supp. 3d at 255. PwC does not concede but has not argued against the proposition that the NYCHRL constitutes "State law" under the EFAA. Compel MOL at 13 n.6.

protection.  In the absence of clear statutory language distinguishing "sexual harassment" from "gender discrimination," one approach—taken by a court in the Northern District of California—is to treat sexual harassment and gender discrimination as coextensive under the NYCHRL.  *See Ding v. Structure Therapeutics, Inc.*, 765 F. Supp. 3d 897 (N.D. Cal. 2025).  Under that approach, a plaintiff receives the EFAA's protection simply by stating a *claim* under § 8-107(1)(a)(3).  In essence, conduct constituting sexual harassment—sufficient to trigger the EFAA—is interpreted to capture any "conduct involving treating [a] plaintiff less well than other employees based on her gender."  *Id.* at 902; *see also Delo v. Paul Taylor Dance Found., Inc.*, 685 F. Supp. 3d 173, 182 (S.D.N.Y. 2023) ("Under the NYCHRL, a plaintiff alleging a hostile work environment theory of sexual harassment only needs to show that she has been treated less well than other employees because of her gender." (internal quotation marks omitted)).

Judge Oetken examined this same issue and took a different approach.  Given that "several provisions" of the NYCHRL state that "sexual harassment 'is a form of unlawful discrimination,'" he concluded that "gender discrimination and sexual harassment are not coextensive under the statute."  *Singh*, 750 F. Supp. 3d at 256 (citing N.Y.C. Admin. Code §§ 8-107(29)(b), 8-107(30)(b)(1), 8-132(a)(1)(a)).  Therefore, Judge Oetken held that a plaintiff cannot assert the protection of the EFAA simply because they state a claim under § 8-107(1)(a)(3); the plaintiff must also allege that the discriminatory conduct meets some definition of "sexual harassment."  *Singh*, 750 F. Supp. 3d at 256–58; *see also Diaz-Roa v. Hermes L., P.C.*, 757 F. Supp. 3d 498, 545 (S.D.N.Y. 2024) (suggesting that "it [] is reasonable to believe" that there is a distinction between a claim of gender discrimination and allegations of sexual harassment); *Faith v. Khosrowshahi*, No. 21-cv-6913, 2023 WL 5278126, at *7 n.5 (E.D.N.Y. Aug. 16, 2023); *Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 554 (S.D.N.Y. 2023) (not reaching this issue because the plaintiff "adequately allege[d] . . . sexualized conduct").

13

The Court agrees with Judge Oetken that the most straightforward reading of the NYCHRL is that sexual harassment is a subcategory of conduct within the broader category of gender-based discrimination.  *See* N.Y.C. Admin. Code § 8-107(29)(b)(1) ("[S]exual harassment [is] a form of unlawful discrimination under local law."); *see also Sexual Harassment*, Black's Law Dictionary (12th ed. 2024) ("Sexual harassment is a type of employment discrimination").  New York case law supports that reading.  *See Williams*, 872 N.Y.S.2d at 37, 39 (holding that sexual harassment "is one species of sex- or gender-based discrimination" and distinguishing "harassment cases" from "other terms-and-conditions cases").  While the standard for asserting liability under the NYCHRL is the same whether the alleged conduct is discrimination or the subset of discrimination termed "sexual harassment," that does not mean those types of conduct are the same.  *See id.* at 39 ("[T]he primary issue for a trier of fact in harassment cases, as in other terms-and-conditions cases, is whether the plaintiff has proven by a preponderance of the evidence that she has been treated less well than other employees because of her gender."); *Yost v. Everyrealm, Inc.*, 657 F. Supp. 3d 563, 580 n.12 (S.D.N.Y. 2023) (quoting *Raji v. Societe Generale Ams. Sec. LLC*, No. 15-cv-1144 (AT) (JLC), 2018 WL 1363760, at *7 (S.D.N.Y. Feb. 28, 2018)).  *Ding* is therefore wrong to conflate the standard for claiming discrimination under § 8-107(1)(a)(3) with the standard for alleging conduct constituting sexual harassment.  *Ding*, 765 F. Supp. 3d at 902.  *Ding* ignores the fact that New York law recognizes that sexual harassment is a subset of discrimination.

The Court therefore agrees with Judge Oetken that in order to determine whether the EFAA applies to a NYCHRL case, a court must analyze the nature of the conduct alleged and not rely solely on the cause of action asserted.[3]  That approach is consistent with the language of the EFAA, which does not focus on whether the plaintiff *asserts a claim* under the federal or state sexual

---

[3] New York City could choose to define sexual harassment as all discriminatory conduct that meets the standard set by § 8-107(1)(a)(3), but that is not how the statute is presently written.

14

harassment statute. Rather, the EFAA applies when a plaintiff "*alleg[es] conduct*" that "constitute[s] sexual harassment" under federal or state law.[4] 9 U.S.C. §§ 401(4), 402(a) (emphasis added).[5]

Therefore, for Owens's case to fall within the scope of the EFAA, her NYCHRL discrimination claims must include allegations of conduct that constitutes sexual harassment as defined by the NYCHRL.

### 2. "Sexual Harassment" as Defined by the NYCHRL

The question, accordingly, becomes how to define the subset of discriminatory conduct that is also "sexual harassment." As stated above, the NYCHRL does not explicitly define sexual harassment. Based on the text of the NYCHRL, on agency guidance, and on the relevant case law, the Court concludes that for the purpose of the EFAA, conduct constituting sexual harassment under the NYCHRL should be defined as "unwelcome verbal or physical behavior based on a person's gender," regardless of whether that behavior is lewd or sexual in nature. *Stop Sexual Harassment Act*, NYC Commission on Human Rights, https://www.nyc.gov/site/cchr/law/sexual-harassment-training-main.page (last visited May 21, 2025).

This standard is drawn from the guidance published by the New York City Commission on Human Rights (the "Commission"), whose interpretation of the NYCHRL is persuasive authority. *See Wang v. James*, 40 N.Y.3d 497, 501–02 (2023) ("Deference is accorded to an agency's interpretation of a statute when the interpretation involves the specialized competence or expertise the agency has developed in administering the statute."). The NYCHRL provides that the

---

[4] *Ding*'s approach focusing on the statutory basis for liability functionally reads the phrase "conduct that is alleged to constitute" out of the EFAA.

[5] While legislative intent has no bearing on the Court's statutory analysis, it is relevant to mention that earlier proposals to amend the FAA to preclude forced arbitration of "sex discrimination" disputes did not pass. *See* S. 2203, 115th Cong. § 2 (2017); H.R. 4570, 115th Cong. § 2 (2017); H.R. 1443, 116th Cong. § 2 (2019). And in 2010, Congress passed another piece of legislation that prevented the Department of Defense from awarding certain contracts if the contractors use mandatory arbitration agreements covering both "sexual assault or harassment" claims *and* Title VII claims. Pub. L. No. 111-118, § 8116, 123 Stat. 3409, 3454-55 (2009). These facts cut against the notion that Congress intended for a broad reading of the term "sexual harassment dispute" that includes all sex discrimination claims.

Commission "shall post conspicuously on the commission's website online resources about sexual harassment." N.Y.C. Admin. Code § 8-132(a). On the Commission's website, sexual harassment is defined as "unwelcome verbal or physical behavior based on a person's gender." *Stop Sexual Harassment Act*, NYC Commission on Human Rights, https://www.nyc.gov/site/cchr/law/sexual-harassment-training-main.page (last visited May 21, 2025). Further, in accordance with the NYRCHL's provision that employers "conspicuously display an anti-sexual harassment rights and responsibilities poster designed by the commission," N.Y.C. Admin. Code § 8-107(29)(a), the Commission posted example posters on its website, which also define sexual harassment as "unwelcome verbal or physical behavior based on a person's gender," *Stop Sexual Harassment Act Notice*, NYC Commission on Human Rights, https://www.nyc.gov/assets/cchr/downloads/pdf/materials/SexHarass_Notice8.5x14-English.pdf (last visited May 21, 2025).

The Court declines to adopt a requirement that the unwelcome verbal or physical behavior be lewd or sexual in nature. PwC, citing *Singh*, argues that Owens must plead "romantic, sexual, or lewd conduct" to allege conduct constituting sexual harassment. Compel MOL at 14; *see Singh*, 750 F. Supp. 3d at 257 ("[W]hen sexual harassment claims have been litigated under the NYCHRL, successful plaintiffs have alleged conduct or language of the same kind of romantic, sexual, or lewd nature."). In *Singh*, Judge Oetken held that the plaintiff's allegations of mistreatment based on her gender did not constitute sexual harassment. *Singh*, 750 F. Supp. 3d at 257–58. Among other things, she alleged that her boss credited male employees with her accomplishments, ignored her contributions, assigned projects to male employees over her, interrupted her, questioned whether her pregnancy would impact her job, and subjected her to baseless performance criticisms. *Id.* While the court held that such conduct "surely constitute[s] gender discrimination under the NYCHRL," it did not rise to the level of "sexual harassment." *Id.* at 258. To the extent that *Singh*

16

requires that a plaintiff allege romantic, sexual, or lewd conduct to allege conduct constituting sexual

harassment, the Court departs from *Singh*.[6]

 Rather, the Court holds that under the NYCHRL, conduct constituting sexual harassment is

unwelcome verbal or physical behavior based on a person's gender, regardless of whether that

behavior is lewd or sexual in nature. Put simply, if a plaintiff alleges that they were harassed by

being shouted at or shoved and that the harassment or assault was motivated by their gender, the

Court's analysis need not turn on whether the words shouted or the contact made was sexual in

nature.

 The Commission's guidance, posted on its website, supports the conclusion that conduct

constituting sexual harassment need not be lewd or sexual in nature. The Commission's list of

examples of sexual harassment includes "unwanted touching" with no qualifier about whether the

touching must be sexual in nature. *Stop Sexual Harassment Act*, NYC Commission on Human Rights,

https://www.nyc.gov/site/cchr/law/sexual-harassment-training-main.page (last visited May 21,

2025). Other listed examples specifically characterize offending gestures or remarks as "sexualized"

or "suggestive." *Id.* Therefore, the Commission's guidance suggests that non-sexualized unwanted

touching is conduct constituting sexual harassment. The Commission's example notice posters also

list examples of sexual harassment. These lists include "making sexist remarks or derogatory

comments based on gender." *Stop Sexual Harassment Act Notice*, NYC Commission on Human

Rights, https://www.nyc.gov/assets/cchr/downloads/pdf/materials/SexHarass_Notice8.5x14-

English.pdf (last visited May 21, 2025). "Derogatory comments based on gender" does not

necessarily imply lewd or sexual conduct. Thus, rather than cabining sexual harassment as lewd or

sexualized discrimination, the City's interpretation of sexual harassment under the NYCHRL seems

to turn on whether there was sex-based *harassment*, i.e., unwelcome verbal or physical behavior based

---

[6] The Court notes that the allegations in *Singh* would also not meet the lower bar outlined by the Court here.

on a person's gender.

The Second Circuit's interpretation of more restrictive federal law further supports the view that conduct need not be lewd or sexual in nature to constitute sexual harassment.  Under Title VII, a claim of "sexual harassment in the work place can proceed under two theories:  quid pro quo harassment and a hostile work environment." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 62 (2d Cir. 1998); *see also Petrosino v. Bell A.*, 385 F.3d 210, 225–26 (2d Cir. 2004).  And "to prove an actionable hostile work environment" claim, a plaintiff needs "neither 'sex-specific and derogatory terms' nor any evidence that 'sexual desire' motivated the harassment." *Gregory v. Daly*, 243 F.3d 687, 695 (2d Cir. 2001), *as amended* (Apr. 20, 2001).  The Second Circuit "has found workplace situations discriminatory under a hostile work environment theory where the conduct at issue, though lacking any sexual component or any reference to the victim's sex, could, in context, reasonably be interpreted as having been taken on the basis of plaintiff's sex." *Id.*  While "hostile work environment" is "a term of art borrowed from the more restrictive Title VII jurisprudence" and does not have a direct application in the NYCHRL context, *Mitura v. Finco Services, Inc.*, 712 F. Supp. 3d 442, 452 n.3 (S.D.N.Y. 2024), the NYCHRL is intended to be more protective than its federal equivalent.  Therefore, it would be incompatible with the statute for the Court to adopt a requirement that conduct constituting sexual harassment under the NYCHRL be sexual or lewd in nature when no such limitation is read into Title VII.  *See Mihalik v. Credit Agricole Cheuvreux N.A., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (noting that the NYCHRL "created a 'one-way ratchet,' by which interpretations of state and federal civil rights statutes can serve only as a *floor* below which the [NYCHRL] cannot fall" and that "its provisions [must] be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof").

At least three courts in the Southern District have held that conduct constituting sexual harassment is adequately alleged even if little to none of the harassing conduct alleged is lewd or

sexual.  *See, e.g.*, *Mitura v. Finco Services, Inc.*, 712 F. Supp. 3d 442, 453 (S.D.N.Y. 2024) (where the plaintiff was subject to "weekly, degrading comments and insults" related to her age, gender, and race); *Delo*, 685 F. Supp. 3d at 183–84 (where the plaintiff alleged that her supervisors made sexist comments, commented on her pregnancy, hovered over her desk while she was pumping breast milk, chastised her for bringing her baby on a performance trip, and fired her without a reason); *Brazzano*, 2025 WL 963114, at *2, *7–8 (holding that, aside from the allegation of a lewd comment, the plaintiff alleged sexual harassment "in the form of a hostile work environment" where "she was subjected to [] objectively hostile and abusive" conduct such as insults, exclusion, and demeaning comments).

It is also worth noting that the standard this Court employs to determine whether conduct constitutes sexual harassment under the NYCHRL for purposes of the EFAA—unwelcome verbal or physical behavior based on a person's gender that need not be sexual or lewd in nature—is a higher bar than simply alleging that a plaintiff was "treated less well than other employees because of [] gender."  *Delo*, 685 F. Supp. 3d at 182.  While previous cases in this District set the bar for conduct constituting sexual harassment at being "treated less well than other employees because of [] gender," *Johnson*, 657 F. Supp. 3d at 554, simply citing the standard for general § 8-107(1)(a)(3) liability, those cases did not have to grapple with the issue of the lower bound because the conduct in those cases clearly constituted sexual harassment.  *See, e.g.*, *id.* at 554 ("Yorio's conduct, as alleged, is all the more clearly actionable under the NYCHRL because, as alleged, she propositioned or goaded Johnson towards engaging in workplace sexual conduct multiple times within a short period . . . and while making other sexualized comments.").  Their invocation of the low NYCHRL liability standard alone is dicta because those cases were not presented with the types of borderline fact patterns presented in this case and in *Singh*.  *See also Faith v. Khosrowshahi*, No. 21-cv-6913, 2023 WL 5278126, at *3, *7 n.5 (E.D.N.Y. Aug. 16, 2023) (holding that allegations of a discriminatory

"facial verification program" that prevented an employee from working at various times did not constitute a "sexual harassment dispute"). And to the extent that these cases drew this dicta from the standard for "stat[ing] a sexual harassment *claim* under the NYCHRL," the Court believes that they make the same mistake as *Ding* in conflating the broad category of conduct that establishes NYCHRL liability with the narrower category of conduct that constitutes sexual harassment. *Johnson*, 657 F. Supp. 3d at 553 (emphasis added).

### 3. Owens Plausibly Pleads Conduct Constituting Sexual Harassment Under the NYCHRL

Owens plausibly alleges conduct constituting sexual harassment under the NYCHRL because Owens plausibly alleges that Rawal harassed her with unwelcome verbal behavior on the basis of her gender. In particular, Rawal denigrated her in front of subordinates and verbally threatened and berated her, sometimes yelling at her in front of directors. Am. Compl. ¶ 76; *see Mitura*, 712 F. Supp. 3d at 453 (holding that "degrading comments and insults" as well as comments meant to "humiliate" the plaintiff stated a claim for sexual harassment under the NYCHRL); *Brazzano*, 2025 WL 963114, at *2, *7–8 (holding that the plaintiff alleged sexual harassment where "she was subjected to [] objectively hostile and abusive" conduct such as insults, exclusion, and demeaning comments).

The Amended Complaint further alleges that other female partners complained about similarly disrespectful and derogatory conduct. Am. Compl. ¶ 77; *see Delo*, 685 F. Supp. 3d at 184 n.4 ("[T]he Court may, when analyzing a hostile work environment claim, consider allegations of mistreatment toward employees other than the plaintiff." (citing *Patane v. Clark*, 508 F.3d 106, 114 (2d Cir. 2007); *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 151 (2d Cir. 1997))). Meanwhile, drawing reasonable inferences from the Amended Complaint in Owens's favor, Rawal did not treat male coworkers on his projects with the same behavior. Am. Compl. ¶ 76; *see Delo*, 685 F. Supp. 3d at 183–84 (S.D.N.Y. 2023) (holding that sex-based harassment was established when, among other

things, a supervisor "chastised [the plaintiff] in front of her team . . . even though he did not similarly criticize male employees").

These allegations are sufficient to meet the NYCHRL's low bar for pleading discriminatory intent. "While the NYCHRL is 'not a general civility code,' it should be construed 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.'" *Delo*, 685 F. Supp. 3d at 183 (citations omitted) (quoting *Mihalik*, 715 F.3d at 109, 113). Owens's allegations that she and other women were publicly demeaned and disparaged in a way that allegedly none of their male colleagues were, are sufficient to plausibly plead that the behavior she faced was based on gender in violation of the NYCRHL. *See Syeed v. Bloomberg L.P.*, 568 F. Supp. 3d 314, 321 (S.D.N.Y. 2021), *vacated and remanded on other grounds*, No. 22-1251, 2024 WL 2813563 (2d Cir. June 3, 2024) (holding that a plaintiff's allegation that she was "denied resources" and opportunities given to male colleagues is "sufficient to state a claim" under the NYCHRL); *Nezaj v. PS450 B. and Rest.*, 719 F. Supp. 3d 318, 332 (S.D.N.Y. 2024) (holding that withholding the only female manager's schedule while providing "all male managers with their scheduled in advance . . . classically describes differential treatment based on a discriminatory motive sufficient to plead a claim under the NYCHRL" (internal quotation marks and citations omitted)).

The Court notes, for the purposes of clarifying the standard developed above, that Owens's allegations relating to Russell and Garvey are not adequately pleaded to be conduct constituting sexual harassment, even though those allegations state a plausible claim of discrimination under § 8-107(1)(a)(3). According to the Amended Complaint, Russell and Garvey "were working together to prevent Owens from getting tenure" by denying her opportunities. Am. Compl. ¶ 50. Russell allegedly provided Owens very few leads despite providing leads to young male directors and principals in his practice group. *Id.* ¶ 51. He also denied her projects, which he instead staffed with

male directors.  *Id.* ¶ 58.[7]  The Court finds that this type of behavior, while plausibly discriminatory, is not conduct constituting sexual harassment.  This behavior is not unwelcome verbal or physical behavior directed at Owens; rather, it is conduct that occurred behind Owens's back that gave her fewer opportunities to excel.  However, under the standard endorsed in *Ding*, Russell and Garvey's conduct would be viewed as conduct constituting sexual harassment merely because she was "treated less well than other employees because of her gender."  *Ding*, 765 F. Supp. 3d at 901.  And under the standard employed in *Singh*, none of Rawal's, Russell's, or Garvey's conduct would constitute sexual harassment because their conduct evinces no "romantic, sexual, or lewd" undertones.  *Singh*, 750 F. Supp. 3d at 257–58 (holding that "interrupting [the plaintiff] in meetings," "inappropriately questioning" her commitment based on sexist stereotypes, and "subjecting her to false and baseless performance criticisms" does not constitute sexual harassment).

### 4.  Owens Plausibly Pleads That She Was an Employee of PwC

Owens plausibly pleads that she was an employee of PwC and therefore falls within the protection of the NYCHRL anti-discrimination provision.  The NYCHRL prohibits discrimination "in terms, conditions or privileges of *employment*."  N.Y.C. Admin. Code § 1-807(1)(a)(3) (emphasis added).  "The plain terms of § 8-107(1)(a) [therefore] make clear that the provision's coverage only extends to employees, for an 'employer' logically cannot discriminate against a person in the 'conditions or privileges of employment' if no employment relationship exists."  *Wang v. Phoenix Satellite TV US, Inc.*, 976 F. Supp. 2d 527, 532 (S.D.N.Y. 2013).  Therefore, Owens must adequately

---

[7] And discriminatory intent is plausibly pleaded given that Russell and Garvey explicitly stated that "women make terrible consulting partners" and that "women should not be partners."  Am. Compl. ¶ 50.  *See Lenart v. Coach Inc.*, 131 F. Supp. 3d 61, 69 (S.D.N.Y. 2015) (finding the plaintiff's "thin" allegations were nonetheless sufficient to state a claim under the NYCHRL where the plaintiff alleged that he had to "undergo extra interviews and psychological testing, whereas his female colleagues did not," and that he had heard his supervisors expressed a preference for working with women); *Delo*, 685 F. Supp. 3d at 184 ("That a male dancer was allegedly allowed to modify his dance steps due to his age, while Bugge was not permitted to make 'even de minimis changes' to her steps during her pregnancy—all while being told by Tomlinson that she was an 'embarrassment' as a pregnant woman—reinforces the inference that the Company treated female employees 'less well' due to their gender.").

allege that she had an employment relationship with PwC in order to plausibly plead a sexual harassment claim under the NYCHRL.[8]

For purposes of the NYCHRL, "an employee is '[s]omeone who works in the service of another person (the employer).'" *Doe v. Bloomberg, L.P.*, 36 N.Y.3d 450, 460 (2021) (quoting Black's Law Dictionary (11th ed. 2019)). The New York Court of Appeals has held that when "determin[ing] who is an employer" under New York common law, courts should consider four factors: "(1) the selection and engagement of the servant; (2) the payment of salary or wages; (3) the power of dismissal; and (4) the power of control of the servant's conduct." *Griffin v. Sirva, Inc.*, 29 N.Y.3d 174, 186 (2017) (internal citation and quotation marks omitted); *see also Fernandes v. Jadah Carroll, LLC*, 134 N.Y.S.3d 181, 182 (N.Y. App. Div. 1st Dept. 2020) (holding that in the NYCHRL context, "control over the conduct of another including selection, payment of wages, and power of dismissal . . . is the essential element of being an employer" (internal quotation marks and brackets omitted)). "[T]he really essential element of the relationship is the right of control, that is, the right of one person, the master, to order and control another, the servant, in the performance of work by the latter." *Griffin*, 29 N.Y.3d at 186.

Owens adequately pleads that, though she had the title of "principal," she "was really an employee." Am. Compl. ¶ 16. She alleges that, although she was compensated primarily in equity "shares" of PwC—and therefore shared in the profits and losses of the firm—PwC could "grant or take away her shares each year as it chose," in essence controlling her compensation to a degree. *Id.*

---

[8] PwC is correct that generally "[w]here the District Court is required to determine arbitrability . . . the summary judgment standard is appropriate." *Wachovia Bank, Nat. Ass'n v. VCG Spec. Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011). And "[i]f there is a genuinely disputed factual issue whose resolution is essential to the determination of the applicability of an arbitration provision, a trial as to that issue will be necessary." *Id.* However, what is at issue in determining whether the EFAA applies is not a matter of fact; it is a question of whether a plaintiff has *alleged* certain facts. *See* 9 U.S.C. § 402(a). "In other words, [courts] must decide whether a sexual harassment claim is 'sufficiently pled to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).'" *Brazzano v. Thompson Hine LLP*, No. 24-cv-01420 (ALC) (KHP), 2025 WL 963114, at *6 (S.D.N.Y. Mar. 31, 2025). And "[e]valuating the sufficiency of a complaint is not a 'fact-based' question of law." *Ashcroft v. Iqbal*, 556 U.S. 662, 674 (2009). Therefore, it is inappropriate to apply the summary judgment standard to this question.

23

¶¶ 16, 32, 33. Therefore, this factor does not weigh strongly for or against Owens's employee status. *See Baskett v. Autonomous Research LLP*, No. 17-cv-9237 (VSB), 2018 WL 4757962, at *6 (S.D.N.Y. Sept. 28, 2018) (denying pre-discovery summary judgment on employee status where a plaintiff disputes that she "holds an unconditional ownership stake in the Firm").

She also alleges that "[u]nder the terms of the conditional offer, PwC had up to five years to either admit Owens as a full principal, or dismiss her." Am. Compl. ¶ 38. "Prior to full admission, Owens did not have any rights under the Partners and Principals Agreement to challenge a dismissal." *Id.* And indeed, Owens alleges that she was informed that "the Board was forcing her 'withdrawal'" and that she could stay "no longer" than June 26, 2024, the day before certain of her benefits would have vested. *Id.* ¶¶ 101, 102. PwC contends that it "did not fire Owens" because it "could only *withdraw* her" upon the recommendation of a partner in a management position and a vote of a subcommittee of the Board. Compel MOL at 24 (emphasis in original). But PwC provides no binding case law in support of the position that a termination arrangement of this kind made Owens an employee as a matter of law. Therefore, at this stage, the Court finds that the fact that a select few partners in management positions had the power to "withdraw" her from her job weighs slightly in favor of the fact that she was plausibly an employee. *See Caruso v. Peat, Marwick, Mitchell & Co.*, 664 F. Supp. 144, 149 (S.D.N.Y. 1987) ("The typical firm may not fire a partner or otherwise terminate his employment merely because of disappointment with the quantity or quality of his work, but may only remove the partner in extraordinary circumstances."); *Baskett*, 2018 WL 4757962, at *6 (denying pre-discovery summary judgment where "hiring, firing, and status-change of partners is determined by a small subset of partners—the Executive Committee, of which she is not a member").

Most importantly, Owens plausibly alleges that PwC exercised a degree of control over the performance of her work. "Owens was supervised by several layers of management, which could

24

assign her to work and remove her from projects and clients." Am. Compl. ¶ 16; *see also id.* ¶ 44 ("In Owens's first few months, PWC leaders asked her to be the Engagement Partner on several projects, responsible for overall client management and delivery quality of the projects."); *id.* ¶ 54 ("PWC was going to replace Owens on the projects with a white, male partner."). Management could also allegedly "prevent her from traveling to conferences or firm events." *Id.* ¶ 16; *see id.* ¶ 69 ("Hoover told Owens that she did not want Owens to attend a global PWC financial services event to present on the TSYS partnership she was leading. This denied Owens the opportunity to meet other principals responsible for TSYS accounts."). Management could also "disapprove her sales or deals from moving forward." *Id.* ¶ 16; *see also id.* ¶ 58 ("Russell also took away any leads Owens obtained that were not related to card payments."); *id.* ¶ 63 ("The change order contract was intercepted by the account team and signed by Steve Moysey, a white man about five years younger than Owens, even though Owens was the EP on the prior work."). Management also exerted control over her projects, specifically directing who would participate and who would receive credit. *Id.* ¶ 89 ("PwC nonetheless required Owens to add several additional partners to each contract and on one contract required that Owens give 40% of the revenue to a white, male partner."); *id.* ¶ 92 ("Owens wanted to staff one of the major projects for Client A with the Asian-American woman who had helped Owens develop the payments risk practice. However, PWC insisted that Owens staff a white, male partner and allocate 40% of the revenue to him. Owens was allowed to staff the Asian-American woman only as an SME and give her 10% of the revenue.").

These allegations are weighed against the numerous other allegations that Owens also had a significant degree of autonomy. *See, e.g., id.* ¶ 60 ("Owens saw a market opportunity to focus on a new area relating to payments risk. She created thought leadership and an approach to the market for this new focus."); *id.* ¶ 65 ("[Owens] originated, sold, and delivered a number of smaller projects in consumer payments and with credit card components."). Nonetheless, at this stage, the Court

finds that Owens plausibly pleads that PwC controlled her work.  Therefore, considering the relevant factors, the Court finds that Owens plausibly pleaded that she was an employee of PwC.

### B.  Motion to Stay Arbitration

Owens moves this Court for an order staying the AAA Action.  Dkt. No. 54.  Because the claims raised in the AAA Action are not a part of this case, the Court declines to stay the arbitration.

### 1.  The EFAA Does Not Apply to the AAA Claims

The EFAA does not command a stay of the AAA Action because the AAA Claims are not a part of Owens's case.  As discussed above, the EFAA provides that "no predispute arbitration agreement . . . shall be valid or enforceable with respect to *a case* which is *filed* under Federal, Tribal, or State law and relates to [a] sexual assault dispute or [a] sexual harassment dispute."  9 U.S.C. § 402(a) (emphasis added).  Multiple courts in the Southern District have analyzed the EFAA and determined that the "clear, unambiguous, and decisive" meaning of the statute is that an arbitration clause is invalid with respect to the plaintiff's entire case, not to individual claims.  *Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 558 (S.D.N.Y. 2023); *see also Diaz-Roa v. Hermes L., P.C.*, 757 F. Supp. 3d 498, 532 (S.D.N.Y. 2024).

A "case" is "a general term for an action, cause, suit, or controversy . . . a question contested before a court of justice."  *Higazy v. Templeton*, 505 F.3d 161, 171 (2d Cir. 2007) (quoting *Black's Law Dictionary* 215 (6th ed. 1990)); *see also Chavez v. Martinez*, 538 U.S. 760, 766 (2003) ("The words 'case' and 'cause' are constantly used as synonyms in statutes and judicial decisions, each meaning *a proceeding in court, a suit, or action*." (emphasis in original) (quoting *Blyew v. United States*, 80 U.S. 581, 595 (1872)).  "An 'action' refers to the whole of the lawsuit."  *Brownback v. King*, 592 U.S. 209, 220 (2021) (Sotomayor, J. concurring) (citing *Black's Law Dictionary* 37 (11th ed. 2019) (defining "action" as a "civil or criminal judicial proceeding"); *Black's Law Dictionary* 43 (3d ed. 1933) ("The terms 'action' and 'suit' are now nearly, if not entirely, synonymous.")).  By contrast, a "claim" is "the

assertion of an existing right; any right to payment or to an equitable remedy." Black's Law Dictionary (11th ed. 2019). And a "cause of action" is "'a group of operative facts giving rise to one or more bases for suing,' or 'a factual situation that entitles one person to obtain a remedy in court from another person.'" *Johnson*, 657 F. Supp. 3d at 559 (quoting Black's Law Dictionary (11th ed. 2019)).

"Congress knows how to use the narrower term 'claim' when it so intends." *Diaz-Roa v. Hermes L., P.C.*, 757 F. Supp. 3d 498, 532 (S.D.N.Y. 2024). "Indeed, Congress used the narrower term elsewhere in the [EFAA] concerning the [amendment's] effective date: Congress provided in a statutory note that the EFAA 'shall apply with respect to any dispute or claim that arises or accrues on or after March 3, 2022.'" *Id.*; *see also Johnson*, 657 F. Supp. 3d at 559. "When Congress includes particular language in one section of a statute but omits it in another, [the court] presumes that Congress intended a difference in meaning." *Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 161 (2018). "The reading of the EFAA that lends coherence to the use of these separate terms assigns distinct meanings to 'case' and 'claim,' with the former referring to the entirety of the lawsuit in which claim(s) implicating a sexual harassment dispute are brought." *Johnson*, 657 F. Supp. 3d at 560.

Therefore, the text of the EFAA does not support the view that at the election of the party making a sexual harassment allegation, a pre-dispute arbitration agreement is unenforceable with respect to all *claims* related to the sexual harassment dispute, regardless of whether the claims are actually raised in a pending lawsuit. *Contra Mitura*, 712 F. Supp. 3d at 451 (stating that when the EFAA applies, "any pre-dispute arbitration agreement is unenforceable with respect to *all causes of action* relating to that dispute" (emphasis added)). Owens therefore misstates the meaning of the EFAA when she argues that "[t]he AAA *claims* . . . are subject to the EFAA and therefore not arbitrable to begin with." Stay Reply at 2–3 (emphasis added).

While Owens cites cases that emphasize that the EFAA's purpose was to "override—in the

sexual harassment context—the FAA's background principle that, in cases involving both arbitrable and non-arbitrable claims, the former must be sent to arbitration even if this will lead to piecemeal litigation," *Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 560 (S.D.N.Y. 2023) (internal quotation marks omitted), those cases are inapposite because in those cases, all of the arbitrable claims were first raised in the same judicial proceeding as the sexual harassment claims. *See, e.g.*, *Puris v. TikTok Inc.*, No. 24-cv-944 (DLC), 2025 WL 343905, at *6 (S.D.N.Y. Jan. 30, 2025) (rejecting "defendants' application to *sever* the claims not involving allegations of sexual harassment" (emphasis added)); *Diaz-Roa*, 757 F. Supp. 3d at 532 & n.9 (declining to "carve up" a "case to which the EFAA applies"). The arbitrable claims to which those opinions refer were therefore a part of the same *case* related to the sexual harassment dispute. Here, the AAA Claims have not been raised in this case, are therefore not a part of this case, and are therefore not covered by the EFAA.[9][10]

---

[9] Owens provides no case law in support of her contention that claims not raised in a case are still part of the case. Stay MOL at 14.

[10] An interesting question is whether an arbitration proceeding is a "case" under the EFAA. In a scenario such as this one, where a defendant commences an arbitration asserting claims potentially related to a sexual harassment dispute, does that arbitration constitute a "case" in which the arbitration provision is invalid? Owens has not raised this question, so the Court declines to rule definitively on it.

However, it seems likely that an arbitration proceeding is not a "case filed under Federal, Tribal, or State law," and therefore it seems likely that the EFAA's provision invalidating arbitration agreements would not apply to one. "Arbitration is not a 'judicial proceeding.'" *McDonald v. City of W. Branch, Mich.*, 466 U.S. 284, 288 (1984); *see Higazy v. Templeton*, 505 F.3d 161, 171 (2d Cir. 2007) (holding that "case" is "a general term for an action, cause, suit, or controversy . . . a question contested before a court of justice." (quoting *Black's Law Dictionary* 215 (6th ed. 1990))); *see also Chavez v. Martinez*, 538 U.S. 760, 766 (2003) ("The words 'case' and 'cause' are constantly used as synonyms in statutes and judicial decisions, each meaning a *proceeding in court, a suit, or action*." (emphasis in original) (quoting *Blyew v. United States*, 80 U.S. 581, 595 (1872))). "Arbitration is 'a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration.'" *Coinbase, Inc. v. Suski*, 602 U.S. 143, 148 (2024) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)). The language of the FAA distinguishes a "suit or proceeding [] brought in any of the courts of the United States" from the "*controversy* [] arising out of [a] contract or transaction" to be "settle[d] by arbitration." 9 U.S.C. §§ 3, 5 (emphasis added).

Therefore, the plain text of the EFAA, which refers to "cases" related to sexual assault and sexual harassment disputes, suggests that the law renders arbitration provisions unenforceable with respect to a judicial proceeding in a court of law, not with respect to an arbitration commenced in another forum. It is also notable that the EFAA states that the case must be "*filed under* Federal, State, or Tribal law." 9 U.S.C. § 402(a) (emphasis added); *see, e.g.*, Fed. R. Civ. P. 3 ("A civil action is commenced by filing a complaint with the court."). It does not state that the case must "arise under" federal, state or tribal law. Further note that the EFAA uses the word "case" to define the proceedings with respect to which the arbitration provisions are unenforceable, while using the word "dispute" in all other contexts. *See* 9 U.S.C. § 401. The potential consequence of such a reading of the statute would be that the EFAA prevents a defendant in a sexual assault dispute from compelling arbitration of any of the plaintiff's claims in a pending court case, but it does not allow a plaintiff to force a defendant to bring their related, arbitrable counterclaims into the court case.

## 2.  The Court Has No Other Legal Basis to Stay the AAA Action

Owens provides no authority under which the Court may enjoin the AAA Action at this stage.  Owens does not dispute that she entered into a binding arbitration agreement.  Dkt. No. 55 ¶ 1; *see In re Am. Exp. Fin. Advisors Securities Litig.*, 672 F.3d 113, 141 (2d Cir. 2011) (holding that a district court may stay an arbitration when the parties "have not consented to arbitrate a claim").  Instead, she argues that the EFAA renders the agreement unenforceable, *see* Section IV.B.1 above, and that the AAA Claims are compulsory counterclaims in this action.  However, even assuming that the AAA Claims are compulsory counterclaims under Fed. R. Civ. P. 13(a), the Court sees no basis for enjoining the AAA Action.

As an initial matter, there is not binding precedent in this circuit on the issue of whether compulsory counterclaims not raised in a prior action are barred in later arbitration proceedings.  The Third Circuit, in a case cited favorably by multiple courts in the Southern District, declined to hold that waived compulsory counterclaims are barred in subsequent arbitration proceedings.  *Bristol Farmers Mkt. and Auction Co. v. Arlen Realty & Dev. Corp.*, 589 F.2d 1214, 1220–21 (3d Cir. 1978); *see also Calloway on Behalf of LMN Productions, Inc. v. Marvel Ent. Group, A Div. of Cadence Industries Corp.*, 564 F. Supp. 107, 108 (S.D.N.Y. 1983) (citing *Bristol Farmers*, 589 F.2d 1214) ("[I]t does not follow that because a compulsory counterclaim not raised in the first action is barred in subsequent litigation, the defendant is barred from pressing its claim in arbitration proceedings."); *Pompano-Windy City Partners, Ltd. v. Bear, Stearns & Co., Inc.*, 698 F. Supp. 504, 520 n.13 (S.D.N.Y. 1988) (citing *Calloway*, 564 F. Supp. at 108) (holding that arbitrable counterclaims need not be asserted in the federal case).  The Third Circuit based its decision, at least in part, on the "strong public policy in favor of arbitration."  *Bristol Farmers*, 589 F.2d at 1220.

Even if Rule 13 does bar previously waived compulsory counterclaims in subsequent arbitration proceedings, it is inappropriate at this stage for the court to stay the AAA Action on that

basis alone.  Owens provides no authority that permits a district court to preemptively rule on defenses she may or may not raise in the AAA Action.  Then District Judge Richard J. Sullivan commented on the reasons a court should not:

> [T]here is no reason for the Court to enjoin Defendant[s] from bringing, in a different forum, subsequent claims related to this action.  Rule 13 of the Federal Rules of Civil Procedure provides the standard for compulsory counterclaims and the Court finds no grounds for issuing a preemptive injunction to enforce this rule.  In any subsequent claim brought by Defendant[s], Plaintiff[] [is] free to argue that the claim constitutes a compulsory counterclaim and should have been brought in this case.  Whether they prevail on that argument will be an issue for that court.

*David v. Rabuffetti*, No. 08-cv-5647 (RJS), 2011 WL 1346997, at *4 (S.D.N.Y. Mar. 30, 2011) (Sullivan, J.).[11]

While Owens argues that the Court has "broad remedial powers" to stay an arbitration "irrespective of the 'jurisdictional hook,'" Stay Reply at 2, the case Owens cites is not a full-throated pronouncement of that proposition.  Rather, the case Owens cites says in dicta simply that "courts have found such authority *may* exist under the All Writs Act."  *Credit Suisse AG v. Graham*, 533 F. Supp. 3d 122, 128 n.2 (S.D.N.Y. 2021).  In fact, the Second Circuit has left open the question of whether the All Writs Act "authorizes district courts to enjoin arbitration to prevent relitigation of their prior judgments."  *Citigroup, Inc. v. Abu Dhabi Inv. Auth.*, 776 F.3d 126, 133 (2d Cir. 2015).  The *Citigroup* court held that while some other circuits "have sanctioned the use of the All Writs Act to enjoin arbitrations that threaten federal judgments," it was not appropriate in a case where the judgment that was threatened merely confirmed an arbitration award.  *Id.* at 131–32.  That is because the district court that confirmed the award did not "resolve[] the merits of [the] case."  *Id.*  Such a court is not "in the best position to protect its judgment" because it was not as "familiar with what [was] considered and decided in the proceedings leading to that judgment."  *Id.* at 132.  In this case,

---

[11] Relatedly, Owens's request that the Court declare that "should PwC choose not to bring the AAA Claims as counterclaims in this action, those claims [are] waived," Stay MOL at 2, is an impermissible request for an advisory opinion.  Owens may bring the proper application for relief in whatever subsequent forum PwC raises the AAA Claims.

the Court has neither entered a final judgment nor otherwise resolved the merits of this case.

Therefore, the Court concludes that it would not be appropriate to preemptively bar the AAA

Claims in a separate action.  *Cf. U.S. Fire Ins. Co. v. Natl. Gypsum Co.*, 101 F.3d 813, 816 (2d Cir.

1996) (holding that where parties have agreed to arbitrate, issue preclusion must be addressed by the

arbitrator).[12]  For these reasons, the Court declines to enjoin the pending AAA Action.

## V.      CONCLUSION

For the foregoing reasons, Defendants' motion to compel arbitration of the claims in this

action is denied, and Plaintiff's motion to stay the pending arbitration is denied.  Additionally,

because this opinion and order moots Plaintiff's application for a temporary stay of the pending

arbitration, Dkt. No. 81, Plaintiff's application for a temporary stay is denied.  The Clerk of Court is

directed to terminate the motions pending at Dkt. Nos. 43, 54, 81.

SO ORDERED.

Dated: June 12, 2025
New York, New York

_____
GREGORY H. WOODS
United States District Judge

---

[12] To the extent that issues to be decided in this case under the EFAA may be earlier decided in the AAA Action, there is support in the case law for the proposition that an arbitral judgment does not have preclusive effect where "Congress intended the statutes at issue . . . to be judicially enforceable and [where] arbitration could not provide an adequate substitute for judicial proceedings in adjudicating claims under those statutes."  *McDonald v. City of W. Branch, Mich.*, 466 U.S. 284, 289 (1984).  Courts "are to 'take into account the federal interests warranting protection.'"  *Benjamin v. Traffic Exec. Ass'n E. Railroads*, 869 F.2d 107, 113 (2d Cir. 1989) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 223 (1985) (holding that where "RICO claims are arbitrable, . . . we detect no statutory barrier to granting an arbitral finding preclusive effect over an issue presented in a RICO claim")).